**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

ADAM BROWN, on behalf of himself and
all others similarly situated,

      Plaintiff,                          Case No. 1:23-cv-00374-DAE

      v.                              Hon. David A. Ezra

LEARFIELD COMMUNICATIONS,
LLC, SIDEARM SPORTS, LLC,
UNIVERSITY OF TEXAS AT AUSTIN, and
THE UNIVERSITY OF TEXAS AT AUSTIN
ATHLETICS,

      Defendants.

_____

**DEFENDANT LEARFIELD COMMUNICATIONS, LLC AND SIDEARM SPORTS,
LLC'S 12(b)(1), 12(b)(6), and 12(b)(7) MOTION TO DISMISS PLAINTIFF'S
COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

ARGUMENT ...................................................................................................3

I.   LEARFIELD IS IMMUNE FROM SUIT AS A GOVERNMENT
     CONTRACTOR ...........................................................................................3

II.  IF THE COURT FINDS THAT THE UT DEFENDANTS ARE IMMUNE,
     PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE THEY
     ARE INDISPENSABLE PARTIES .................................................................4

III. PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN
     BE GRANTED ............................................................................................6

     a.   Plaintiff Does Not—And Cannot—Allege That Learfield Disclosed
          Any Information That Would Readily Permit An Ordinary Person To
          Determine Plaintiff's Video Viewing History ...........................................7

     b.   Plaintiff Does Not—And Cannot— Allege That He Is A "Consumer"
          Protected By The VPPA ........................................................................8

     c.   Plaintiff Does Not—And Cannot—Allege The Learfield Defendants
          Are "VTSPs ........................................................................................9

     d.   Plaintiff Does Not—And Cannot—Allege That Learfield Knowingly
          Disclosed PII In Violation Of The VPPA................................................10

          i.   Plaintiff Fails To Allege That Learfield Discloses PII .................11

               1.   The FID Is Not PII .........................................................11

               2.   Even If The FID Was PII, Plaintiff Alleges That His
                    Own Browser Disclosed The Information, Not
                    Learfield.........................................................................13

          ii.  Plaintiff Fails To Allege That Learfield Knowingly Disclosed
               PII...................................................................................15

IV.  THE VPPA IS UNCONSTITUTIONAL AND FAILS TO PASS
     INTERMEDIATE SCRUTINY..........................................................................16

     a.   The VPPA Is Unconstitutionally Vague and Overbroad ...........................17

b.      The Government Has No Substantial Interest In Restricting
Disclosure of Identifying Information With Video Watching
Information ............................................................................................18

c.      The VPPA's Requirements Do Not Materially Advance, And Are Far
More Extensive Than Necessary To Serve, Any Government Interest .....19

V.      THE VPPA, AS APPLIED, VIOLATES THE FIRST AMENDMENT ...............21

CONCLUSION .....................................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................6

*Bd. of Trustees of State Univ. of New York v. Fox*,
  492 U.S. 469 (1989)..............................................................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................6

*Berry v. Texas Woman's Univ.*,
  528 F. Supp. 3d 579 (E.D. Tex. 2021) ...................................................................3

*Bonin v. Sabine River Auth.*,
  65 F.4th 249 (5th Cir. 2023) ..................................................................................4

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973)...................................................................................16, 17, 18

*Brown v. Entertainment Merchants Assoc.*,
  131 S.Ct. 2729 (2011)...........................................................................................18

*Carter v. Scripps Networks, LLC*,
  No. 22-cv-2031 (PKC), 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023)...............8, 9

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
  447 U.S. 557 (1980)..............................................................................................16

*City of Houston v. First City*,
  827 S.W.2d 462 (Tex. App. 1992).........................................................................4

*Clark v. Tarrant Cnty., Texas*,
  798 F.2d 736 (5th Cir. 1986) .................................................................................3

*Eichenberger v. ESPN, Inc.*,
  No. 14–cv–463 (TSZ), 2015 WL 7252985 (W.D. Wash. May 7, 2015) ...............11

*Ellis v. Cartoon Network, Inc.*
  803 F.3d 1251 (11th Cir. 2015) .............................................................................11

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) .................................................................................14

i

*In re Hulu Priv. Litig.*,
  No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ....................................11

*In re Nickelodeon Consumer Privacy Litigation*,
  827 F.3d 262 (3d Cir. 2016) .........................................................................7, 11, 12, 13

*IMS Health, Inc. v. Sorrell*,
  131 S.Ct. 2653 (2011)...........................................................................................16, 18, 19

*K.D.F. v. Rex*,
  878 S.W.2d 589 (Tex. 1994) ...............................................................................................4

*Lee v. Anthony Lawrence Collection, L.L.C.*,
  47 F.4th 262 (5th Cir. 2022) ...........................................................................................5, 6

*McCall v. Pelosi*,
  No. SA-22-CV-00093-XR, 2022 WL 4923310 (W.D. Tex. Sept. 30, 2022) .........................6

*In re Meta Pixel Healthcare Litig.*,
  No. 22-cv-03580, 2022 WL 17869218 (Dec. 22, 2022, N.D. Cal. 2022)..........................14, 15

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2nd Cir. 2017)...............................................................................................19

*Mount v. PulsePoint, Inc.*,
  No. 13 CIV. 6592 (NRB), 2016 WL 5080131 (S.D.N.Y. Aug. 17, 2016) ...........................14

*Robinson v. Disney Online*,
  152 F. Supp. 3d 176 (S.D.N.Y. 2015)...........................................................................10, 11

*Ross v. Linebarger, Goggan, Blair & Sampson, L.L.P.*,
  333 S.W.3d 736 (Tex. App. 2010) .......................................................................................4

*U.S. West, Inc. v. FCC*,
  182 F.3d 1224 (10th Cir. 1999) .........................................................................................16

*In re Vizio, Inc., Consumer Priv. Litig.*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) ...............................................................................9

**Statutes**

18 U.S.C. § 2710................................................................................................... *passim*

38 U.S.C. § 7331.........................................................................................................19

**Rules**

Fed. R. Civ. P. 12(b) ............................................................................................ *passim*

Fed. R. Civ. P. 19 .................................................................................................................4, 5

**Other Authorities**

https://www.merriam-webster.com/dictionary/business ......................................................9, 14, 17

https://www.merriam-webster.com/dictionary/cookie................................................................ 14

https://www.merriam-webster.com/dictionary/delivery............................................................. 17

https://www.merriam-webster.com/dictionary/livelihood .......................................................... 9

Defendants Learfield Communications, LLC ("Learfield Communications") and Sidearm Sports, LLC ("Sidearm" and together with Learfield Communications, "Learfield"), by and through their undersigned counsel, hereby respectfully move this Court, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7), to dismiss Plaintiff's Complaint with prejudice.  In support thereof, Learfield states as follows:

## INTRODUCTION

Learfield Communications is a leading media and technology services company in intercollegiate athletics providing a variety of services such as licensing and multimedia sponsorship management, digital and social media, ticketing, data analytics, and more to support college athletic programs. Sidearm, a wholly owned subsidiary of Learfield Communications, is the leading digital fan engagement platform for collegiate sports and provides services related to official websites, mobile apps and more for its college athletics clients. Plaintiff Adam Brown ("Plaintiff") brings this one-count Complaint alleging a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.* ("VPPA") against Learfield, the University of Texas at Austin ("UT"), and The University of Texas at Austin Athletics (the "Longhorns", together with UT, the "UT Defendants", collectively with Learfield, "Defendants").  Plaintiff alleges that, through web services Learfield provided for UT Defendants' website, https://texassports.com/ (the "Team Website"), Defendants collectively violated the VPPA by sharing Plaintiff's Facebook User ID ("FID") and video viewing information to Facebook through use of the Facebook Pixel.

As an initial matter, this Court lacks subject matter jurisdiction over Learfield because the claim arises out of Learfield's alleged actions as a government contractor and, therefore, as an arm of the state entitled to sovereign immunity under the Eleventh Amendment. Additionally, should the Court also grant the UT Defendants' pending Motion to Dismiss based on sovereign immunity,

Plaintiff's Complaint should be dismissed in its entirety for failure to join the indispensable parties. Moreover, Plaintiff's Complaint lacks crucial allegations to bring such a claim against Learfield. Indeed, Plaintiff fails to allege that he is a renter, purchaser, or subscriber of any services provided by Learfield in order to be a protected "consumer" under the VPPA. Plaintiff also fails to allege that an *ordinary person* would be able to glean his video viewing history from the information allegedly shared through the Facebook Pixel, given that it is complex computer code that ordinary persons are not trained to read or decipher. Even more crucially, Plaintiff's allegations state that Plaintiff's own browser—not Learfield—disclosed Plaintiff's FID to Facebook. What's more, Plaintiff fails to allege that Learfield Communications and Sidearm are even video tape service providers ("VTSPs") regulated by the VPPA. Finally, the VPPA is an unconstitutionally overbroad and vague statute and, as a restraint on commercial speech, fails to pass intermediate scrutiny.

## **BACKGROUND**

Plaintiff alleges Learfield Communications "is a collegiate sports marketing company," and Sidearm "is a provider of collegiate athletic web solutions" that "manages websites and mobile platforms, as well as provide[s] the hosting and infrastructure, for colleges and high schools." (Compl. ¶¶ 31-32.)  Plaintiff alleges that "[i]n or around the year 2016, Mr. Brown subscribed to Texas Longhorns' newsletters." (*Id.* ¶ 15.) Further, Plaintiff alleges "The Longhorns benefits from the value created through its use of free e-newsletters and its subscription-based service model." (*Id.* ¶¶ 19, 93.) Plaintiff alleges all "Defendants are video service providers in that they provided pre-recorded audio-visual materials to Plaintiff and Class members on their Team Website." (*Id.* ¶ 28.) Specifically, Plaintiff alleges Learfield Communications and Sidearm "develop, operate, and own the Team Website" and "effectively retain complete control of the Team Website." (*Id.* ¶ 52.) Plaintiff alleges Learfield uses "tracking tools, such as pixels (including Facebook's and its own)"

and use of the Facebook Pixel on the Team Website violates the VPPA because the Facebook Pixel sends Plaintiff's FID and video viewing information to Facebook without Plaintiff's informed, written consent. (*Id*. ¶¶ 53, 91, 132-133, 135.) Plaintiff aims to represent a class defined as "[a]ll persons in the United States with a subscription to the Longhorns' Website that had their personal information improperly disclosed to Facebook through the use of the Pixel (the "Class")." (*Id*. ¶ 107.)

## ARGUMENT

## I. LEARFIELD IS IMMUNE FROM SUIT AS A GOVERNMENT CONTRACTOR.

This Court lacks subject matter jurisdiction over Learfield because Learfield is immune from suit. *See Berry v. Texas Woman's Univ.*, 528 F. Supp. 3d 579, 594–95 (E.D. Tex. 2021) ("Whether a government, its entities, or its representatives in their official capacity have immunity to suit presents a threshold, jurisdictional question that courts appropriately consider on a Rule 12(b)(1) motion."). As laid out in UT Defendants' Motion to Dismiss (Doc. 21), and incorporated by reference herein, UT Defendants are immune from suit pursuant to the Eleventh Amendment. Likewise, as contractors for UT Defendants, Learfield is an arm of the state and, therefore, also immune from suit based on a weighing of the *Clark v. Tarrant Cnty., Texas,* 798 F.2d 736, 744 (5th Cir. 1986) factors for several reasons. First, Plaintiff alleges that Defendants collectively committed a singular violation of the VPPA, *i.e.* Defendants' allegedly unauthorized disclosure of Plaintiff's FID and video viewing information to Facebook. (*See* Compl. ¶¶ 9, 11, 68, 125, 132-133.) Plaintiff alleges that all Defendants collectively "hold[] the decision-making authority over the placement of the Pixel" (*id.* ¶ 68), "utilized the Pixel" (*id.* ¶ 132), and "disclosed Plaintiff's PII, which is triggered automatically through Defendants' use of the Pixel" (*Id*. ¶ 133). In other words, Plaintiff attempts to allege that all Defendants acted in concert to commit a single purported violation of the statute, such that Learfield is entitled to immunity to the same extent as the UT

Defendants. *See K.D.F. v. Rex*, 878 S.W.2d 589, 597 (Tex. 1994) (holding private entity entitled to sovereign immunity protection where it demonstrated its actions were actions of the government, executed subject to the control of the government entity); *Ross v. Linebarger, Goggan, Blair & Sampson, L.L.P.*, 333 S.W.3d 736, 743 (Tex. App. 2010) ("[e]very allegation in [the] petition against [defendant] relates to actions taken in the process of collecting taxes on behalf of the taxing entities. . . .Thus, we conclude that the true nature of [plaintiff's] claims is that of claims against [defendant] in its official capacity as an agent of the taxing entities."); *City of Houston v. First City*, 827 S.W.2d 462, 481 (Tex. App. 1992), writ denied (Sept. 16, 1992) ("imposing personal liability upon its agent while performing this governmental function would be contrary to public policy.")

Furthermore, the Prayer for Relief seeks relief against all Defendants collectively. (Compl. Prayer for Relief.) Therefore, Plaintiff is seeking for money to be paid jointly by the state and Learfield, thereby using public funds to satisfy the judgment. *Bonin v. Sabine River Auth.*, 65 F.4th 249, 254 (5th Cir. 2023) ("[T]he most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds."). Because Plaintiff alleges that Defendants acted in concert to commit a single purported statutory violation and seeks to recover money from public funds as a result of that single purported violation, Learfield is also immune from suit pursuant to the Eleventh Amendment.

## II.   IF THE COURT FINDS THAT THE UT DEFENDANTS ARE IMMUNE, PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE THEY ARE INDISPENSABLE PARTIES.

If the Court finds that the UT Defendants are immune, Plaintiff's Complaint should be dismissed because the UT Defendants are indispensable parties. Pursuant to Federal Rule of Civil Procedure 12(b)(7), failure to join a necessary party is grounds for dismissal. Federal Rule of Civil Procedure 19(a) provides that a party is necessary if: "(A) in that person's absence, the court cannot

accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."

Rule 19(b) further provides that, "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." The factors for the court to consider include: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19.

Here, the UT Defendants are necessary parties because Plaintiff's claims concern allegedly concerted conduct by the UT Defendants and Learfield, which allegedly produced a singular purported statutory violation. *See supra* § I. Therefore, without UT Defendants, the Court cannot accord complete relief, and Learfield would face a substantial risk of incurring double or otherwise inconsistent obligations, which would be very prejudicial to Learfield and could not be lessened or avoided. Further, the UT Defendants have an interest in the content and functionality of their own website and the information that is allegedly collected via the Facebook Pixel, and that interest would be impaired in their absence. *See Lee v. Anthony Lawrence Collection, L.L.C.*, 47 F.4th 262, 268 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1054 (2023) (dismissing case against Learfield

subsidiary for failure to join public university which was immune from suit, because allowing suit to move forward without university would "impair or impede [the University's] ability to protect its interest in the 'Thee I Love' mark" which was "enough to require dismissal of the action because 'there is a potential for injury to' the University's 'interests [as] the absent sovereign'").

A finding that the UT Defendants are immune from suit makes joinder not feasible. *See Lee,* 47 F.4th at 267 ("[t]he Supreme Court . . . said that 'where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign.'"); *McCall v. Pelosi*, No. SA-22-CV-00093-XR, 2022 WL 4923310, at *2 (W.D. Tex. Sept. 30, 2022) ("joinder is likely not feasible because the State enjoys sovereign immunity under the Eleventh Amendment."). Thus, based on equity and good conscience, the Court should dismiss the action in its entirety.

## III.  PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

To state a claim under the VPPA, plaintiff must allege that defendant (1) is a video tape service provider; (2) who knowingly disclosed to any person; (3) personally identifiable information; (4) concerning any consumer. *See* 18 U.S.C. 2710(b)(1). A "video tape service provider" is defined as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual

materials." 18 U.S.C. 2710(a)(4). "Personally identifiable information" is defined as "information *which identifies a person* as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. 2710(a)(3) (emphasis added). Finally, a "consumer" is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. 2710(a)(1).

### a. Plaintiff Does Not—And Cannot—Allege That Learfield Disclosed Any Information That Would Readily Permit An Ordinary Person To Determine Plaintiff's Video Viewing History.

The most basic requirement of a VPPA claim is disclosure of "the kind of information that would ***readily permit an ordinary person*** to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig*., 827 F.3d 262, 267 (3d Cir. 2016) (emphasis added). Plaintiff's Complaint includes this image as the illustrative example of the type of "disclosure" on which he bases his claims:



(Compl. ¶ 90, Figure 4. *See also id.* ¶ 84, Figure 2; *id.* ¶ 88, Figure 3.) That, on its face, is not "information that would ***readily permit an ordinary person*** to identify a specific individual's video-watching behavior." Indeed, Plaintiff spends 145 paragraphs and 34 pages trying to explain why the purported disclosure of this complex computer code should constitute a violation. This is

not information that would readily permit an ordinary person to identify a specific individual's video-watching behavior and is, therefore, not covered by the VPPA.

> **b.  Plaintiff Does Not—And Cannot— Allege That He Is A "Consumer" Protected By The VPPA.**

Plaintiff fails to allege that he purchased, rented, or subscribed to *any* goods or services *from Learfield* as required to be a "consumer" under 18 U.S.C. § 2710(a)(1). Rather, Plaintiff specifically alleges that "[i]n or around the year 2016, Mr. Brown subscribed to *Texas Longhorns' newsletters*," *the Longhorns* "offer guests of the site the option to sign-up for a team newsletter," and "*[t]he Longhorns* benefits [sic] from the value created through its use of free e-newsletters and its subscription-based service model." (Compl. ¶¶ 15, 19, 93 (emphasis added).) Without a single allegation showing that Plaintiff rented, purchased, or subscribed to any goods or services *from Learfield*, Plaintiff is not a "consumer" of Learfield.

Furthermore, Plaintiff does not allege that he is a consumer of video materials through his status as a newsletter subscriber. "The scope of a 'consumer,' when read with sections 2710(b)(1) and (a)(4), is cabined by the definition of 'video tape service provider,' with its focus on the rental, sale or delivery of audio visual materials." *Carter v. Scripps Networks, LLC*, No. 22-cv-2031 (PKC), 2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023). Thus, "[i]n the statute's full context, a reasonable reader would understand the definition of 'consumer' to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large." *Id.* at *6. This interpretation is also supported by legislative history, which explains that the VPPA "is drafted 'to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the [law]." *Id.* (quoting S. REP. 599, 12, 1988 U.S.C.C.A.N. 4342-1, 4342–9). The *Scripps* court dismissed a VPPA claim where the plaintiffs alleged only that they subscribed to a free email

newsletter but did not "plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience." *Id.* at *2. The same is true here, and Plaintiff's Complaint likewise should be dismissed.

### c. **Plaintiff Does Not—And Cannot—Allege The Learfield Defendants Are "VTSPs."**

A "video tape service provider" ("VTSP") is defined as "any person, ***engaged in the business***, in or affecting interstate or foreign commerce, ***of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials*** . . . ." 18 U.S.C. § 2710(a)(4) (emphasis added). The Complaint contains no allegations regarding "prerecorded video cassette tapes," nor does it allege the Learfield defendants are "engaged in the business" of rental, sale or delivery of "similar audio-visual materials." 18 U.S.C. § 2710(a)(4). Plaintiff's failure to allege Learfield is a VTSP cannot be fixed by amendment because Learfield's business does not fall within the statutory language. "Business" is defined as "a usually commercial or mercantile activity engaged in as a means of livelihood." *See* "business" (def. 1a), https://www.merriam-webster.com/dictionary/business (last accessed March 11, 2023). "Livelihood" is defined as "means of support or subsistence." *See* "livelihood" (def. 1), https://www.merriam-webster.com/dictionary/livelihood (last accessed March 11, 2023). Thus, to be "engaged in the business" of a particular activity, that activity must be the company's "means of support or subsistence." *See In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (to be "engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," "the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose"). In other words, delivering video content must be "a focus of the defendant's work"

and businesses which are only "peripherally or passively involved in video content delivery do not fall within the statutory definition of a video tape service provider." *Id.* at 1221-22.

Plaintiff does not allege Learfield is substantially involved in the conveyance of video content on the Team Website. Rather, Plaintiff simply alleges Learfield drafts code to support the UT Defendants' ability to provide videos on their own Team Website and hosts the videos on the Team Website. (Compl. ¶¶ 52, 58-59.) Simply drafting code and providing a digital space for videos to reside to the extent the UT Defendants want to include videos on their Team Website is *not* the same as *delivering* the videos themselves. For example, consider a real estate company that leases its building to a Blockbuster video store which sells and rents movies. The real estate company would not be considered to be "delivering" videos simply because it provided the space for Blockbuster to do so. Plaintiff utterly fails to provide any factual allegations that support its conclusory allegation that the Learfield is a VTSP because Plaintiff fails to allege Learfield themselves select and offer video materials on the Team Website.

### d.  <u>Plaintiff Does Not—And Cannot—Allege That Learfield Knowingly Disclosed PII In Violation Of The VPPA.</u>

Unless a VTSP has provided notice and obtained consent, it is prohibited from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015). The VPPA states that PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). "[T]he information disclosed by a video tape service provider must, at the very least, identify a *particular person*—not just an anonymous individual—and connect this particular person with his or her viewing history." *Robinson*, 152 F. Supp. 3d at 179.

i.   *Plaintiff Fails To Allege That Learfield Discloses PII.*

Plaintiff fails to allege that Learfield discloses PII for two distinct reasons. First, the FID that Plaintiff alleges Learfield discloses is not itself PII. Second, Plaintiff's allegations clearly state that Plaintiff's own browser sends this information, not Learfield.

## 1.   **The FID Is Not PII.**

Plaintiff fails to allege that Learfield disclosed any "personally identifiable information" because the information allegedly disclosed, an FID, is merely a static digital identifier which is not PII. The VPPA "protects personally identifiable information that ***identifies a specific person*** and ***ties that person to particular videos that the person watched.***" *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 285 (quoting *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *8 (N.D. Cal. Apr. 28, 2014) (emphasis added)).[1] Here, Plaintiff's Complaint demonstrates that the sole information allegedly disclosed by Learfield is not itself identifying because the information Plaintiff alleges Defendants disclosed—the FID—is merely a static digital identifier.[2] Static digital identifiers, as defined in *Ellis v. Cartoon Network, Inc*. 803 F.3d 1251, 1257 (11th Cir. 2015), include such things as a unique device identifier that is "randomly generated when a user initially sets up his device and should remain constant for the lifetime of the user's device." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 282, n.124 (citing *Ellis*). These

---

[1] *See also Robinson,* 152 F. Supp. 3d at 182 ("the most natural reading of PII suggests that it is the information actually 'disclos[ed]' by a 'video tape service provider,' 18 U.S.C. § 2710(b)(1), ***which must itself do the identifying*** that is relevant for purposes of the VPPA (literally, 'information which identifies')—***not information disclosed by a provider, plus other pieces of information*** collected elsewhere by non-defendant third parties.") (emphasis added).

[2] The *Nickelodeon* Court noted that "[n]umerous district courts have grappled with the question of whether the Video Privacy Protection Act applies to static digital identifiers" and that "[m]ost have followed the rule adopted in *In re Hulu Privacy Litigation*" wherein "[t]he court [] concluded that static digital identifiers that could, in theory, be combined with other information to identify a person do not count as 'personally identifiable information' under the Act, at least by themselves." 827 F.3d at 283 (collecting cases holding the same including *Robinson*, 152 F. Supp. 3d at 182–83; *Eichenberger v. ESPN, Inc.*, No. 14–cv–463 (TSZ), 2015 WL 7252985, at *4–5 (W.D. Wash. May 7, 2015); *Ellis*, 2014 WL 5023535, at *3).

random strings of numbers, when viewed by an ordinary person, do not identify who that person is. Rather, static digital identifiers "fall[] even further down the spectrum [of identifiable information]" because "[t]o an average person, an IP address o*r **a digital code in a <u>cookie file</u> would likely be of little help in trying to identify an actual person.*" *In re Nickelodeon*, 827 F.3d at 283 (emphasis added). Although some courts have since held that an FID is PII because it can be plugged into a Facebook URL and PII *may* be found on the resulting Facebook profile, this multi-step investigative process does not make the FID, shared through the "c_user" cookie, PII, as explained by the *Nickelodeon* court.

In *In re Nickelodeon*, the type of information at issue was plaintiff's IP address, a user's browser and operating system settings, and most importantly, *a computing device's unique device identifier. Id*. at 281-82. The court explicitly held that "the expansion of privacy laws since the Video Privacy Protection Act's passage demonstrates that, whatever else 'personally identifiable information' meant in 1988, it did not encompass" such static digital identifiers. *Id*. at 286.[3] And unlike other statutes which "gave the FTC authority to expand the types of information that count as personally identifying under that law," "*[t]he Video Privacy Protection Act…does not empower an administrative agency to augment the definition of 'personally identifiable information' in light of changing circumstances or new technologies*. The meaning of that phrase in the Act is, it would appear, **more static.**" *Id*. (emphasis added.) Further, and more importantly, *In re Nickelodeon* explained Congress's subsequent amendment of the VPPA in 2013 demonstrates

---

[3] The court compared the VPPA to the similar Children's Online Privacy Protection Act ("COPPA"), which was amended once by FTC rules in 2000 to define personal information to include "a persistent identifier, such as a customer number held in a cookie or a processor serial number, where such identifier is associated with individually identifiable information" and a second time in 2013 to expand the definition to include "'*any persistent identifier that can be used to recognize a user over time and across different Web sites or online services*,' including but not limited to '*a customer number held in a cookie*, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier.'" *Id*. at 287 (emphasis added).

Congress was "was keenly aware of how technological changes have affected the original Act" and "*[d]espite this recognition*, *Congress did not update the definition of personally identifiable information in the statute.*" *Id.* "What's more, it chose not to do so despite . . . submitted written testimony that" specifically argued for "the addition of Internet Protocol (IP) Addresses and *account identifiers* to the definition of [personally identifiable information]." *Id.* at 288 (emphasis added).

This Court should follow the detailed reasoning set forth by the *Nickelodeon* court to hold the FID that Plaintiff alleges was disclosed is *not* PII because it is merely a static digital identifier that is automatically sent through a cookie file to a single company, which is nothing like the purposeful and public disclosures of actual names with video viewing history to the public at large. *See id.* at 286. Indeed, "[t]he classic example will always be a video clerk leaking an individual customer's video rental history," and "every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." Plaintiff's claim here should be dismissed.

### 2. Even If The FID Was PII, Plaintiff Alleges That His Own Browser Disclosed The Information, Not Learfield.

Plaintiff alleges Learfield added the Facebook Pixel to the Team Website and that "[w]hen a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered," which "may include the title of a video being watched or the URL of the video." (Compl. ¶¶ 83-84.) Plaintiff further alleges "[w]hen a Facebook user logs onto Facebook, a 'c_user' cookie—which contains a user's non-encrypted Facebook User ID number (['FID'])—*is automatically created and stored on the user's device for up to a year.*" (*Id.* ¶ 76 (emphasis added).) While Plaintiff alleges the FID can be utilized to identify someone by "appending the Facebook [F]ID to www.facebook.com" (*Id.* ¶ 77),

importantly, Plaintiff's allegations clearly state "the Pixel … forced **Plaintiff's web browser** to transfer Plaintiff's identifying information, like their Facebook ID." (*Id.* ¶ 132 (emphasis added).)

Plaintiff's allegations align with how cookies generally work. For example, *In re Facebook, Inc. Internet Tracking Litig.,* explains that "[w]hen a user creates a Facebook account, more than ten Facebook cookies are placed on the user's browser. These cookies store the user's login ID [FID], and they capture, collect, and compile the referer headers from the web pages visited by the user" and "continued to capture information after a user logged out of Facebook and visited other websites." 956 F.3d 589, 596 (9th Cir. 2020); *see also In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580, 2022 WL 17869218 at *4 (Dec. 22, 2022, N.D. Cal. 2022) ("Cookies are 'small pieces of text used to store information on web browsers.'"); *Mount v. PulsePoint, Inc*., No. 13 CIV. 6592 (NRB), 2016 WL 5080131, at *1-2 (S.D.N.Y. Aug. 17, 2016) ("Persistent cookies, commonly called 'tracking cookies,' are designed to remain after the user moves on to a different website or even after the browser is closed. Persistent cookies are set by third parties, including advertising companies that have placed ads on the first-party website."). A "cookie" as defined by Merriam-Webster's dictionary is "a small file or part of a file **stored on a World Wide Web user's computer,** created and subsequently read by a website server, and containing personal information (such as a user identification code, customized preferences, or a record of pages visited)." (*See* "Cookie" (df. 3) (https://www.merriam-webster.com/dictionary/cookie) (last visited June 1, 2023) (emphasis added).

The dictionary definition of a "cookie" and case law on third-party Facebook cookies make clear that Plaintiff's FID is stored on Plaintiff's computer—not by Learfield—and subsequently transmitted to Facebook by Plaintiff's own browser. Therefore, even if this Court were to find that FIDs are PII (which they are not), Learfield is not the one that transmits the FIDs to Facebook.

Plaintiff fails to allege Learfield discloses any other PII, such as his name, to Facebook. Rather, his claim relies solely on the alleged transmission of his FID to Facebook which is transmitted by Plaintiff's own browser ***because Plaintiff has given Facebook consent to collect such information***. (Compl. ¶ 76 "When a Facebook user logs onto Facebook, a 'c_user' cookie . . . is automatically created and stored"); *see In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 at *5 ("Meta gives users the ability to control the use of information about their off-Facebook activity (such as activity on third-party websites) for advertising purposes" and "Users can 'disconnect' the off-Facebook activity that has been associated with their account—which prevents the data from being used for personalized advertising"). Because Plaintiff's specific allegations support that Plaintiff's FID is transmitted by his own website browser, which he consented to— not by Learfield—and because he does not allege that Learfield discloses any other PII to Facebook, Plaintiff fails to allege that Learfield discloses PII.

        ii.   *Plaintiff Fails To Allege That Learfield Knowingly Disclosed PII.* Beyond Plaintiff's failure to allege that Learfield disclosed PII at all, *see supra* § III(d)(i), he also does not allege that Learfield had any way to know whether he, or any other user, had an FID, much less what those FIDs were, or whether Plaintiff set his browser to allow Facebook cookies. Therefore, the Complaint does not and cannot plausibly assert that Learfield *knowingly* disclosed his FID, let alone his PII, to Facebook.

IV.    **THE VPPA IS UNCONSTITUTIONAL AND FAILS TO PASS INTERMEDIATE SCRUTINY.** The VPPA is facially unconstitutional because it is a vague and overbroad restraint on commercial speech. Indeed, lawsuits like this one are only being filed because several terms are undefined in the VPPA, prompting plaintiffs to bring suit even if just a *single video* is placed on a website and viewed—which has led to an explosion in VPPA lawsuits in the last year. [4]

The First Amendment states, "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. Restrictions on access to information in private hands, such as customer data, violate the First Amendment. *See IMS Health, Inc. v. Sorrell*, 131 S.Ct. 2653, 2671 (2011) (holding Vermont statute violated First Amendment where the statute purported to restrict pharmacies from selling retained information about drug prescribing habits of doctors to pharmaceutical companies for marketing purposes.); *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1224 (10th Cir. 1999) (holding that an FCC regulation violated the First Amendment where it restricted telecommunication carriers from using customer information "that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship" because it made speech more difficult by limiting the ability of carriers to target their speech to a particular audience).

Like the information at issue in *IMS Health* and *U.S. West*, the information at issue in this case – "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" – is commercial speech. As such, any restriction on that speech must meet three conditions in order to survive: (1) the government must

---

[4] Indeed, since 2022 alone, more than 100 complaints alleging violations of the VPPA have been filed against defendants from all sectors and industries, which simply provide videos on their websites, including Hallmark Cards, NBCUniversal Media (owner of Today.com), Intuit, Gannett Company (largest newspaper publisher in the U.S.), Weight Watchers, The Philadelphia Inquirer, the National Football League (d/b/a the NFL), Major League Baseball Advanced Media L.P., Equifax, and La-Z-Boy.

have a "substantial interest in regulating the speech," (2) the regulation must "directly and materially advance[ ] that interest," and (3) the regulation must be "no more extensive than necessary to serve the interest." *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980). In addition, the VPPA's "language may not be unconstitutionally vague or its prohibitions too broad in their sweep, failing to distinguish between conduct that may be proscribed and conduct that must be permitted." *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973). The VPPA does not meet any of these conditions.

    **a.**   <u>**The VPPA Is Unconstitutionally Vague and Overbroad.**</u>

    The recent explosion of VPPA litigation is due to the VPPA's overbroad and vague restriction on "any person*, engaged in the *business* . . . of rental, sale or *delivery* of prerecorded video cassette tapes or similar audio visual materials" from knowingly disclosing "to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(a)-(b) (emphasis added). Plaintiffs in cases such as this one are advocating for the statute to apply to a broad range of entities that should not be regulated by the VPPA, which has caused, and will continue to cause, other entities not before this Court to refrain from constitutionally protected speech. As the Supreme Court has held, a statute is overbroad and, "[l]itigants are permitted to challenge a statute . . . because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612.

    The recent onslaught of lawsuits is possible only because the language of the VPPA is so vague and overbroad that plaintiffs are interpreting the VPPA to allow suit even if just a *single*

*video* is placed on a website and viewed. The words "business" and "delivery" are undefined in the statute, but their dictionary definitions are overly broad for the statutory purpose.[5]

Based on these overly broad, undefined words, plaintiffs have stretched Congress' intention to regulate video tape service providers, such as the video store rental companies contemplated in the legislative history, to absurd conclusions. The number and breadth of VPPA claims brought against companies from all industries, described *supra* § IV, fn.4, proves the language of the VPPA "fail[s] to distinguish between conduct that may be proscribed and conduct that must be permitted" and it likely "cause[s] others not before the court to refrain from constitutionally protected speech." *Broadrick,* 413 U.S. at 612. This is because, based on a definition of "video tape service provider" as a "business" that "rents, sells, or delivers" audio visual materials, persons in any and all sectors, including restaurants, greeting card companies, and retail stores, may refrain from otherwise legal speech due to fear that they will fall under the VPPA's purview, simply because they operate a website that contains video content.

    **b.** **The Government Has No Substantial Interest In Restricting Disclosure of Identifying Information With Video Watching Information.** Even if the VPPA was not unconstitutionally vague and overbroad, the government does not have a "substantial interest" in restricting disclosure of "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710. As the Supreme Court has explained, "without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may

---

[5] "Business" is defined as "a usually commercial or mercantile activity engaged in as a means of livelihood" or "a commercial or sometimes an industrial enterprise" ("business" (def. 1a, 1b), https://www.merriam-webster.com/dictionary/business), while "delivery" is defined as "the act or manner of delivering something." *See* "delivery" (def. 1), https://www.merriam-webster.com/dictionary/delivery.

not revise the judgment [of] the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." *Brown v. Entertainment Merchants Assoc.*, 131 S.Ct. 2729, 2734 (2011). There is no "persuasive evidence" that restrictions on this information imposed under Section 2710 are "part of a long tradition of proscription." *Id.*

**c.  The VPPA's Requirements Do Not Materially Advance, And Are Far More Extensive Than Necessary To Serve, Any Government Interest.** Finally, even if the government does have a "substantial" interest in preventing the disclosure of video viewing information, "[t]here must be a 'fit between the legislature's ends and the means chosen to accomplish those ends.'" *IMS Health*, 131 S. Ct. at 2668 (quoting *Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 480 (1989)). "These standards ensure … that the State's interests are proportional to the resulting burdens placed on speech…" *Id.*

The consent requirements in § 2710(b)(2)(B)(i)-(iii)[6] fail these standards. The very existence of § 2710(b)(2)(B) confirms that the government's purported privacy interest is not limitless, but rather ends once "informed, written consent" is obtained. Congress could have, and should have, stopped there: the phrasing "informed, written consent … ***that*** …" implicitly acknowledges that informed consent can be obtained in many ways, rather than definitionally requiring the elements set forth in subsections (i)-(iii). 18 U.S.C. § 2710(b)(2)(B) (emphasis

---

[6] Section 2710(b)(2)(B) requires "informed, written consent (including through an electronic means using the Internet) of the consumer that – (i) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; (ii) at the election of the consumer that—(I) is given at the time the disclosure is sought; or (II) is given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, which is sooner; and (III) the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B).

added.) Indeed, elsewhere in the federal code, "implied consent" stands on its own as a principle subject to rulemaking, *see, e.g.*, 38 U.S.C. § 7331, underscoring the lack of a single definition.

But the VPPA does not stop at informed consent. Instead, § 2710(b)(2)(B)(i)-(iii) creates onerous and arbitrary specifications that do not materially advance the purported government interests and go far beyond the prevailing understanding of enforceability of online Terms and Conditions or Privacy Policies. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2nd Cir. 2017) (explaining that "clickwrap" agreements are "routinely" enforced). Unlike the VPPA, the ample case law interpreting the VPPA does not prioritize "distinct and separate" consent, temporal limitations on consent, or providing opportunity for withdrawal, because the incremental benefits to consumers of such procedural obligations are minimal. Indeed, subsections (i)-(iii) provide users with no additional information necessary to make an informed decision regarding having personal usage information shared with third parties; they only create materially burdensome—and free speech-chilling—compliance requirements.

**V.      THE VPPA, AS APPLIED, VIOLATES THE FIRST AMENDMENT.** The VPPA, as applied to Learfield, is far too vague and overbroad. If the VPPA is interpreted as Plaintiff is advocating, Learfield is potentially subject to the VPPA as a "video tape service provider" and prohibited from sharing otherwise legal commercial information with third parties, as is common in all commercial industries, even though Learfield is nothing like the "video rental store" contemplated by Congress when enacting the VPPA. Rather than make clear the types of entities regulated by the statute, the statute is being interpreted by plaintiffs to allow for regulation of any "business" that "delivers" audio visual materials.

## <u>CONCLUSION</u>

For the foregoing reasons, Learfield Communications, LLC and Sidearm Sports, LLC respectfully request that this Court dismiss Plaintiff's Class Action Complaint with prejudice.

Dated: June 9, 2023

Respectfully submitted,

*/s/Rachel Palmer Hooper*
Rachel Palmer Hooper
Texas Bar No. 24039102
**BAKER & HOSTETLER LLP**
811 Main Street, Suite 1100
Houston, TX 770002
Telephone: 713.751-1600
Facsimile:  713-751-1717
rhooper@bakerlaw.com

Bonnie Keane DelGobbo (*pro hac vice*)
Illinois Bar No. 6309394
**BAKER & HOSTETLER LLP**
1 North Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: 312-416-8185
Facsimile: 312-416-6201
bdelgobbo@bakerlaw.com

*Attorneys for Defendants Learfield*
*Communications, LLC and Sidearm Sports, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically filed on June 9, 2023 with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

<u>*/s/Rachel Palmer Hooper*            </u>