**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| ADAM BROWN, on Behalf of Himself and All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>LEARFIELD COMMUNICATIONS, LLC, SIDEARM SPORTS, LLC, THE UNIVERSITY OF TEXAS AT AUSTIN, and THE UNIVERSITY OF TEXAS AT AUSTIN ATHLETICS,<br><br>      Defendants. | **Case No.: 1:23-cv-00374-DAE** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE UNIVERSITY OF TEXAS AT AUSTIN'S AND THE UNIVERSITY OF TEXAS AT AUSTIN ATHLETICS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 1

ARGUMENT ............................................................................................................... 4

    A.   The UT Defendants Should Be Enjoined From Their Role In Allowing The VPPA
           Violations And, To The Extent A Waiver Of Immunity Is Needed, The Unique Facts
           Here Warrant That Consideration ..................................................................................... 4

       1.   The Unique Set of Facts Here Support Consideration of A Waiver of Immunity .......... 4

       2.   The Longhorns Website Subscribers Have A Legitimate Expectation Of Privacy ........ 8

    B.   The Relief Sought Against The UT Defendants Is Injunctive In Nature ........................... 9

    C.   The Operator Defendants' Purported Obligation To Indemnify the UT Defendants from
           Liability ........................................................................................................................ 13

    D.   The VPPA As A Valid Exercise of Congress' Section 5 Powers .................................... 15

    CONCLUSION ............................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aiello v. Collier,*
  2023 U.S. Dist. LEXIS 56624 (S.D. Tex. 2023) ....................................................... 13

*Alden v. Maine,*
  527 U.S. 706, 119 S. Ct. 2240 (1999) .................................................................... 16

*Allen v. Cooper*,
  140 S. Ct. 994 (2020) ............................................................................................. 16

*Amazon.com LLC v. Lay,*
  758 F. Supp. 2d 1154 (W.D. Wash. 2010) .............................................................. 17

*Brown & Gay Eng'g, Inc. v. Olivares*,
  461 S.W.3d 117 (Tex. 2015) ................................................................................... 14

*Bryant v. Tex. Dep't of Aging & Disability Servs*.,
  781 F.3d 764 (5th Cir. 2015) ..................................................................................... 4

*Catalina Dev., Inc. v. Cty. of El Paso*,
  121 S.W.3d 704 (Tex. 2003) ..................................................................................... 5

*Ex Parte Young,*
  *209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)* ............................................... 10

*Fed. Sign v. Texas S. Univ*.,
  951 S.W.2d 401 (Tex. 1997) ..................................................................................... 5

*Fitzpatrick v. Bitzer*,
  427 U.S. 445, 49 L. Ed. 2d 614, 96 S. Ct. 2666 (1976) .......................................... 16

*Gakuba v. Hollywood Video, Inc*.,
  2015 U.S. Dist. LEXIS 132161 (D. Or. 2015) ........................................................ 12

*Green v. Mansour*,
  474 U.S. 64, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985) ........................................... 12

*Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*,
  2022 U.S. Dist. LEXIS 43617 (E.D. Tex. Mar. 11, 2022) ...................................... 13

*PennEast Pipeline Co., LLC v. New Jersey*,
  141 S. Ct. 2244 (2021) ........................................................................................... 16

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) .................................................................................................. 16

*Sharyland Water Supply Corp. v. City of Alton*,
354 S.W.3d 407 (Tex. 2011) ............................................................................. 6

*Slayton v. Cheadle,*
2023 U.S. Dist. LEXIS 13275 (S.D. Tex. 2023) ............................................... 12

*Smith v. Collier,*
2022 U.S. Dist. LEXIS 224101 (S.D. Tex. 2022) ............................................. 12

*Stamps v. Univ. of Tex. at Austin*,
2022 U.S. Dist. LEXIS 30372 (W.D. Tex. Feb. 22, 2022) ................................ 13

*Tex. Nat. Res. Conservation Comm'n v. IT-Davy*,
74 S.W.3d 849 (Tex. 2002) ............................................................................... 6

*Tex. S. Univ. v. State St. Bank & Tr. Co*.,
212 S.W.3d 893 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ............... 6, 8, 9

*Texas v. United States EPA*,
2023 U.S. Dist. LEXIS 45797 (S.D. Tex. 2023) ............................................... 12

*Torres v. Texas Dep't of Pub. Safety*,
142 S. Ct. 2455 (2022) ...................................................................................... 16

*Travis v. Reno*,
163 F.3d 1000 (7th Cir. 1998) ........................................................................... 17

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002) .................................................................................... 10, 12

## Statutes

18 U.S.C. § 2710(b)(2)(B) ........................................................................................ 4

18 U.S.C. § 2710(b)(2)(B)(i)-(ii) .............................................................................. 4

## Other Authorities

S. Rep. No. 100-599 (1988) ............................................................................. 8, 9, 17

THE FEDERALIST NO. 32 at p. 200 ............................................................................ 16

THE FEDERALIST NO. 81 at 548-49 (J. Cooke ed. 1961) (Alexander Hamilton) ........... 16

## INTRODUCTION

The University of Texas at Austin ("UT Austin") and The University of Texas at Austin Athletics ("UT Austin Athletics," collectively, the "UT Defendants") argue that Plaintiff's claims against the UT Defendants are barred by sovereign immunity. For the reasons set forth below, The UT Defendants' motion to dismiss should be denied and the case against the UT Defendants should proceed.

## BACKGROUND

The University of Texas, Austin (UT) partnered with Learfield Communications, LLC ("Learfield") and Sidearm Sports, LLC ("Sidearm" and together with Learfield, "Operator Defendants"), for the Operator Defendants to build, run, and manage UT's Longhorns website (the "Longhorns Website").[1] In reality, the UT Defendants handed over operational control of its website to the Operator Defendants. Compl. ¶ 143. Operator Defendants' website design and operation services used for the Longhorns Website is consistent with the nearly identical services the Operator Defendants provide to at least 1,100 other college and high school sports teams, including private and public institutions.[2] Part of that website design included hosting videos for UT and providing email newsletter subscriptions that "deliver official news and updates from UT Athletics" including "information on upcoming events and promotions; special ticket discounts;

---

[1] *Sidearm Sports Bolsters Relationship with University of Texas Athletics*, LEARFIELD (Aug. 15, 2016) https://www.learfield.com/2016/08/sidearm-sports-bolsters-relationship-with-university-of-texas-athletics/ (last visited June 15, 2023).

[2] *Press Release: Sidearm Sports, VenueNext Create New Digital Platform to Help Universities Elevate Gameday Fan Experience*, SIDEARM (May 20, 2020) https://playbook.sidearmsports.com/partnerships/press-release-sidearm-sports-venuenext-create-new-digital-platform-to-help-universities-elevate-gameday-fan-experience/ (last visited June 15, 2023); *see* also Compl. ¶ 33.

. . . and Texas Longhorns Official Team Shop offers."[3]  Email newsletters also contain headlines, "behind-the-scenes videos and photographs," ticket on-sale dates, discounts to events, updates for Longhorn Foundation donors, and season ticket information. *See id*. ¶¶ 58-60.

Across its hundreds of team websites,[4] Operator Defendants make use of the same code, implementing the same video streaming platforms.  Compl. ¶¶ 58-60.  Despite the many available video streaming platforms, each of Operator Defendants' websites, including the Longhorns Website, make use of YouTube and/or CBS to provide video streaming services.  *Id.*  Despite many websites making use of anonymized or obscured video titles in webpage URLs, each of the Operator Defendants' websites, including the Longhorns Website, use webpage naming schemes that identify the content or title of the videos on the websites to make "them more recognizable by search engines and easier to access . . . ."[5]  Each of Operator Defendants' websites contain code to track user activity and monetize it by providing targeted ads on the websites, including the Longhorns Website.[6]  Each of the Operator Defendants' websites even contain the same

---

[3] *UT Athletics and IMG College/Longhorn Sports Marketing products*, TEXAS SPORTS https://texassports.com/sports/2013/7/25/GEN_0725130745.aspx (last visited June 15, 2023).
[4] *Press Release: Sidearm Sports, VenueNext Create New Digital Platform to Help Universities Elevate Gameday Fan Experience*, SIDEARM (May 20, 2020) https://playbook.sidearmsports.com/partnerships/press-release-sidearm-sports-venuenext-create-new-digital-platform-to-help-universities-elevate-gameday-fan-experience/ (last visited June 15, 2023) ("[Sidearm is] behind more than 1,300 collegiate athletics websites and mobile apps").
[5] *New URL Structure,* SIDEARM (Oct. 8, 2019) https://playbook.sidearmsports.com/features/new-url-structure/ (last visited June 15, 2023).
[6] *CBS Interactive Advances Media and Learfield's Sidearm Sports to Partner in College Sports,* LEARFIELD (Feb. 12, 2018) https://www.learfield.com/2018/02/cbs-interactive-advanced-media-learfields-sidearm-sports-partner-college-sports/ (last visited June 15, 2023) ("[CBS] and Learfield's Sidearm Sports . . . announced a new partnership to jointly produce and operate more than 1,100 college . . . athletic websites . . . [and] the collaboration [between CBS and Sidearm] will open up exciting new monetization opportunities for clients and advertisers across platforms").

comment left by a website developer, noting design requirements imposed by the Operator Defendants' partnership with CBS.  Compl. ¶ 61, figure 5.

Rather than simply servicing and maintaining the Longhorns Website, the Operator Defendants own the Longhorns Website and all IP rights contained within.  *Id*. ¶¶ 43-44.  The Operator Defendants retain the ability to cut off UT from its own website, *id.* ¶ 47, reserve their own space to advertise their role in creating the Longhorns Website on the Longhorns Website, *id.* ¶ 48, the only Terms of Service available to be found on the Longhorns Website are its own Terms of Service, *id.* ¶ 49, and take ownership of the website traffic and its associated data. *Id.* ¶ 51.

In exchange, the Operator Defendants and the UT Defendants profit from the website by sharing ad revenue generated by the Longhorns Website.  *Id.* ¶ 52.  The UT Defendants allow the Operator Defendants to set their advertising code on the Longhorns Website, which bolsters advertising effectiveness, including tracking code such as the Facebook Pixel (the "Pixel"). *Id.* ¶¶ 52-53.

The Pixel tracks user activity and sends reports of that activity, along with the user's personally identifiable information ("PII"), to Facebook through an HTTP Request.  *Id*. ¶¶ 78-81.  The tracked activity includes the titles or descriptions of content contained within the webpage, including audio visual material.  After the UT Defendants relinquished any effective control or oversight on the Operator Defendants' management of the Longhorns Website, the Operator Defendants placed the Pixel on pages containing pre-recorded videos.  *See id*. ¶¶ 84-89.  These Pixels cause subscribers', including Plaintiff's, PII and video watching history to be shared, in violation of the VPPA.  ¶ 92.

The VPPA has its own requirements regarding written, informed consent.  18 U.S.C. §

2710(b)(2)(B).  Such consent must be in a form distinct and separate from any form establishing

other legal or financial obligations of the consumer and at the election of the consumer.  18 U.S.C.

§ 2710(b)(2)(B)(i)-(ii).  Despite having ample opportunity to provide subscribers with notice of

the data sharing practices on the Longhorns Website and to obtain consent, subscribers are not

told what data is collected while navigating the Longhorns Website, when those data collections

occur, and how they are shared.  Compl. ¶ 144.

Investigations made by Plaintiff's counsel have revealed identical VPPA violations

occurring as a result of Operator Defendants' website design and use of the Pixel on at least 173

of Operator Defendants' Division I athletics websites.  These websites all contain similarly

implemented Pixels that result in subscribers' Facebook User IDs and video watching histories

being shared with Facebook.  *See* Declaration of Patrick Yarborough, Exhibit A.

## ARGUMENT

**A.    The UT Defendants Should Be Enjoined From Their Role In Allowing The VPPA Violations And, To The Extent A Waiver Of Immunity Is Needed, The Unique Facts Here Warrant That Consideration**

The UT Defendants argue that Plaintiff's claims are barred by sovereign immunity.  While

Plaintiff cannot dispute that sovereign immunity is a legal principle that would traditionally shield

a governmental entity from being sued without their consent, immunity is not absolute.[7]

### 1.  *The Unique Set of Facts Here Support Consideration of A Waiver of Immunity*

Here, the distinctive facts before this Court and the activity by the UT Defendants at issue

(*see, e.g.,* Compl. ¶ 143 explaining that the UT Defendants handed over control of its website to

---

[7] Specifically, the Eleventh Amendment bars federal "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it.  *Bryant v. Tex. Dep't of Aging & Disability Servs.*, 781 F.3d 764, 769 (5th Cir. 2015) (internal quotations and citation omitted).

the Operator Defendants) – which serve as the basis that they waived their sovereign immunity – have not been examined by any Texas court, or by any court in the country for that matter.  The UT Defendants voluntarily participated in activities that are typical of private entities (*see, e.g.,* Compl. ¶¶ 18, 19), outside the scope of its governmental functions, and which effectuated the violation of consumers' privacy.

In fact, the UT Defendants' arrangement with the Operator Defendants pushes the idea of sovereign immunity to new limits. The alleged conduct is not a traditional, core, or important governmental function. The UT Defendants relinquished all operational control of the Longhorns Website to the Operator Defendants. The conduct alleged is prohibited by federal law. And the UT Defendants appear to have obtained the contractual right to be indemnified and held harmless, in full, from litigation by the Operator Defendants. Sovereign immunity does not and should not apply to shield a state from participating in litigation over ongoing unlawful conduct that is actively permitted by the state, where the function is not governmental, and where the state intentionally relinquished all operational control over its own asset to private entities, who are bound to indemnify the state in the suit.

Further, although the UT Defendants assert immunity under the Federal Constitution, their conduct falls within that contemplated by the Texas Supreme Court in *Federal Sign* as constituting an immunity waiver by conduct under state law.  *Fed. Sign v. Texas S. Univ.*, 951 S.W.2d 401, 408 n.1 (Tex. 1997) ("[t]here may be circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts."); *see also Catalina Dev., Inc. v. Cty. of El Paso*, 121 S.W.3d 704, 705 (Tex. 2003) (recognizing that the *Federal Sign* opinion suggests circumstances that might warrant recognizing a waiver by conduct).  In *Tex. S. Univ. v. State St. Bank & Tr. Co.*, 212 S.W.3d 893,

907 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), the First Court of Appeals found that immunity was waived when a governmental entity induced a private party into contract with promises that a contract would be valid and enforceable, and then disclaimed obligation for $13 million in equipment and services it received by declaring that contract was not valid after all. *State St.*, 212 S.W.3d at 908.  In other words, the court found that Texas Southern University had waived its right to immunity.  The University's own conduct effectuated the waiver.

Plaintiff is not suggesting that this Court ignore precedent *against* the application waiver by conduct.[8] And Plaintiff is not suggesting the UT Defendants committed acts of fraud or took nefarious steps to purposefully steal the private information of users and subscribers of the Longhorns Website.  The facts here, are, however unique and extraordinary in that UT Defendants turned a blind eye, relinquished control of its website, and secured indemnity rights against the Operator Defendants, who then handed over Plaintiff's and subscribers' private information to a third party. Additionally, the UT Defendants failed to implement or enforce safeguards in order to prevent the unlawful sharing of its subscribers' information.

For example, the Longhorns Website provides users with access to video content related to the university's athletics, including pre-recorded clips of games, interviews with players and team staff, sport analysis, and more. Compl. ¶ 2.  The Complaint alleges, and the motion to dismiss does not refute, that Defendants employed the Pixel on the Longhorns Website, the Pixel caused Plaintiff's and Class Members' PII and Video Watching Data to be shared with Facebook,

---

[8] For example, Plaintiff recognizes that the Texas Supreme Court has rejected the invitation to recognize a waiver-by-conduct exception in *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 857 (Tex. 2002) and *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 414 (Tex. 2011), albeit in the breach-of-contract context involving vendor disputes with the government. *IT-Davy*, 74 S.W.3d at 854.

and that Defendants did not obtain Plaintiff's consent for this disclosure in violation of the VPPA. The UT Defendants operationally *relinquished control* of its website to the Operator Defendants. *Id*. ¶ 143. The UT Defendants failed to implement oversight controls, or failed to enforce controls or its purported contractual rights[9], over the Operator Defendants' implementation and operation of the Longhorns Website. *Id.* ¶¶ 44-49; 52; 61-63. That failure led to the violations of the privacy rights of subscribers to the Longhorns Website. *Id.* ¶¶ 83-92. Despite those privacy violations, the UT Defendants continue to sit idly while the Operator Defendants surreptitiously track, store, and share the Longhorns Website's subscribers' PII. In fact, in response to Plaintiff's claim and this litigation,[10] rather than take steps to ensure that the Operator Defendants are in compliance with the law, the UT Defendants – without denying or refuting past or ongoing VPPA violations – seek a blanket immunity.

Operator Defendants disregard their and the UT Defendants' obligations under the VPPA.[11] They chose to employ tracking tools, loaded the tracking methods (including the Facebook Pixel) onto the Longhorns Website, and then facilitated the sharing of subscribers' PII with a third party in a form in which could be used to identify subscribers and subscribers' PII by any ordinary person who comes into possession of that information. Through the overt act of handing over control of its website to the Operator Defendants who then violated the VPPA,

---

[9] In the Learfield-College Agreement (defined below), the Operator Defendants contractually obligated themselves to act "in accordance with the highest standards and commercial practices for operation of an intercollegiate athletics marketing" and further provides for the university to terminate the Learfield-College Agreement for violations by the Operator Defendants of "state, federal or local law." *See infra* § C.

[10] Plaintiff sent a preliminary suit notice and demand letter regarding these potential violations of 18 U.S.C. § 2710 on February 17, 2023.

[11] The Operator Defendants were put on notice of the VPPA violations associated with its operation of its team websites as early as March 31, 2023, when subscribers of the University of Florida Gators Website filed suit against Operator Defendants. *See Edwards et al. v Learfield Communications, LLC*, et al., Case No. 1:23-cv-00065 (N.D. Fla.).

factual circumstances unlike any precedent exists here, with a combination of facts and circumstances that give rise to a consideration of a waiver of immunity by the UT Defendants. *See State St.*, 212 S.W.3d at 907.

### 2.  *The Longhorns Website Subscribers Have A Legitimate Expectation Of Privacy*

The Longhorns Website subscribers have a legitimate expectation of privacy and the UT Defendants' conduct violated those rights.  A violation of those rights is not something to be taken lightly.  Throughout the 1970s and 1980s, Congress passed and amended a series of statutes with the intent of extending privacy protections to "records that contain information about individuals."  S. Rep. No. 100-599 at 2 (1988).  After amending a privacy statute to update and expand the information protected by legislation, a congressionally created commission concluded that, moving forward, national information policies should (i) minimize intrusiveness, (ii) maximize fairness, and (iii) create legitimate, enforceable expectations of confidentiality. *Id.* To further advance privacy policy legislation, the commission recommended establishing duties to not disclose confidential records of individuals without their consent, except in limited circumstances, for organizations which maintained confidential records.  *Id.* at 2-3.

Such duties were increasingly crucial in an era of computerized record gathering, where it would be "relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, [and] what sort of television programs they watch[.]" *Id.* at 5-6.  While seemingly innocuous individually, pooling these types of information created privacy interests that directly affected the ability of people to freely express themselves, freely associate with others, or otherwise partake in the freedoms and independence enshrined in the Constitution. *Id.* at 7.

In an even more exhaustive effort to prevent parts of people's lives from being pieced

together, Congress passed legislation which tried to guard against the disclosure of people's private information.  In 1988, in response to a Supreme Court nominee having his, and his family's, video rental history being published in a Washington-based paper, Congress passed the Video Privacy Protection Act.  *See* Compl. ¶ 25.  The VPPA was established to create a duty of confidentiality when handling information that ties the identity of a person to their video watching habits.

Here, the Operator Defendants completely disregard both their and the UT Defendants' obligation under the VPPA by loading the tracking methods, including the Facebook Pixel, onto the Longhorns Website and facilitating the sharing of subscribers' PII with third parties for any ordinary person to access and use.  Through the overt act of handing over control of its website to the Operator Defendants who then violated the VPPA, factual circumstances unlike any precedent exists here, with a combination of facts and circumstances that give rise to a waiver of immunity by the UT Defendants.  *See State St.*, 212 S.W.3d at 907. The Longhorns Website  users are individuals who had a legitimate expectation of privacy and the UT Defendant's conduct violated those rights.

The VPPA plays a vital role in safeguarding individuals' privacy rights in the realm of video consumption, and the UT Defendants completely disregarded those protections when it relinquished control over its Longhorns Website to the Operator Defendants.  Accordingly, given the unique and extraordinary circumstances surrounding the facts of this case, it would be reasonable for the Court to determine that the UT Defendants waived their sovereign immunity.

**B.**       **The Relief Sought Against The UT Defendants Is Injunctive In Nature**

It is well-established that Eleventh Amendment sovereign immunity does not shield states from injunctive relief to stop ongoing and future violations of federal law. *Verizon Md., Inc. v.*

*Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) ("[Waiver of soverign immunity] is another question we need not decide, because-as the same parties also argue-even absent waiver, Verizon may proceed against the individual commissioners in their official capacities [for violation of the Telecommunications Act of 1996]") (citing *Ex parte Young*, 209 U.S. 123 (1908)).[12]

In Defendants Learfield Communications, LLC's And Sidearm Sports' Motion to Dismiss, *see* Dkt. No. 24 (the "Operator Defendants' MTD"), the Operator Defendants admit that the "UT Defendants are necessary parties because Plaintiff's claims concern allegedly concerted conduct by the UT Defendants and Learfield, which allegedly produced a singular purported statutory violation." Operator Defendants' MTD at 5. The Operator Defendants argue that:

> [W]ithout UT Defendants, the Court cannot accord complete relief, and Learfield would face a substantial risk of incurring double or otherwise inconsistent obligations, which would be very prejudicial to Learfield and could not be lessened or avoided. Further, the UT Defendants have an interest in the content and functionality of their own website and the information that is allegedly collected via the Facebook Pixel, and that interest would be impaired in their absence."

*Id.* In an attempt to convince the Court that it should dismiss claims against the Operator Defendants, the Operator Defendants in turn admit that the claims against the UT Defendants should move forward.

---

[12] If this Court determines that only a claim for injunctive or declaratory relief against an individual state official most responsible for enforcing the law in question can be sustained, *see Ex Parte Young,* 209 U. S. 123 at 155-156, Plaintiff requests leave to amend the Complaint to name as a defendant the individual responsible for enforcing the contract between the Operator Defendants and the UT Defendants. For example, the Learfield-College Agreement, defined *infra*, includes as a signatory the individual who presumably is responsible for enforcing the agreement. In this case, discovery is needed to obtain the agreement between the Operator Defendants and the UT Defendants, but once obtained, Plaintiff can amend the complaint to name the individual who signed the agreement on behalf of the UT Defendants and/or the individual who is the registrant of the domain of the Longhorns Website (Mr. Craig Westemeier, Senior Associate Athletic Director at the University of Texas Office of Brands, Trademarks and Licensing).

Plaintiff does not agree that UT Defendants are "necessary parties" in the manner described by the Operator Defendants in their Motion to Dismiss. In fact, it is the *Operator Defendants'* placement of the Pixel on the Longhorns Website without obtaining the required consent that is the basis for Plaintiff's claims. It is the Operator Defendants that will ultimately incur the costs associated with this litigation, either directly (for causing and effectuating the VPPA violations) or indirectly (due to the purported indemnity obligation they have to the UT Defendants).[13]

Plaintiff's position, however, is that the UT Defendants' involvement in this litigation is meaningful, at minimum, for the injunctive relief sought here. Plaintiff seeks injunctive relief ordering the (i) removal of the Pixel from the Longhorns Website, or (ii) the UT Defendants to stop permitting the operation of the Longhorns Website without appropriate notice to and consent from subscribers. The UT Defendants are responsible for the oversight of the Operator Defendants' operations of the Longhorns Website and are the entities that can cause the Operator Defendants to stop violating the VPPA. Without the UT Defendants' oversight, the Operator Defendants have and continue to violate the privacy rights of Plaintiff and the absent class members. *Cf Gakuba v. Hollywood Video, Inc.*, 2015 U.S. Dist. LEXIS 132161, at *13 (D. Or. 2015) (finding that the plaintiff did not waive sovereign immunity, but noted that "the record does not include any plausible allegation that demonstrates a reasonable likelihood that the government

---

[13] It is unsurprising that the Operator Defendants seek to benefit from whichever direction to Court steers the sovereign immunity discussion. The Operator Defendants appear to hedge against the hopes that this Court finds sovereign immunity for the UT Defendants, and now seek to extend that immunity to themselves. *See* Operator Defendants' MTD at 3-4.

will again illegally obtain Plaintiff's 'personally identifiable information'" so that injunctive relief was no longer available).

"[S]overeign immunity will protect the state or state official only when the claims are based on past actions and past violations of federal law rather than ongoing actions and continuing violations." *Smith v. Collier,* 2022 U.S. Dist. LEXIS 224101, at *6 (S.D. Tex. 2022); *citing Green v. Mansour*, 474 U.S. 64, 73, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985); *see also Slayton v. Cheadle,* 2023 U.S. Dist. LEXIS 13275, at *7 (S.D. Tex. 2023).  While a defendant-State generally enjoys sovereign immunity from monetary damages, *Ex Parte Young* allows for injunctive relief to address irreparable harm, *i.e.*, future disclosures of subscribers' PII stemming from the Longhorns Website in violation of the VPPA. *See Texas v. United States EPA*, 2023 U.S. Dist. LEXIS 45797, at *26 (S.D. Tex. 2023).

To determine whether the plaintiff's claims are barred by sovereign immunity, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Collier,* at *6; *citing Verizon*, 535 U.S. 635, 645 (2002).  Plaintiff's claims here relate to violations of the Federal VPPA statute and, as to the UT Defendants, call for the UT Defendants to assume its responsibility, and contractual rights[14], to stop the Operator Defendants from surreptitiously tracking, storing, and sharing the PII of subscribers to the Longhorns' Website.  *See Aiello v. Collier,* 2023 U.S. Dist. LEXIS 56624, at *16 (S.D. Tex. 2023) ("Plaintiff's request for declaratory relief is not barred by sovereign immunity.")

Because it is the UT Defendants who are responsible for letting the Operator Defendants operate their Longhorns Website, UT Defendants' involvement is injunctive in nature, and their

---

[14] *See infra,* § C.

inclusion would afford Plaintiff and the putative class members prospective relief that would otherwise not be available to them. Plaintiff's prospective, injunctive relief against the UT Defendants should, therefore, survive. *See Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*, 2022 U.S. Dist. LEXIS 43617, at *14-15 (E.D. Tex. Mar. 11, 2022); *Stamps v. Univ. of Tex. at Austin*, 2022 U.S. Dist. LEXIS 30372, at *23 (W.D. Tex. Feb. 22, 2022).

**C.     The Operator Defendants' Purported Obligation To Indemnify the UT Defendants from Liability**

At this stage of this litigation, Plaintiff's allegations are premised on only publicly available information.  Plaintiff can establish that, by all accounts, the Operator Defendants have complete control over the Longhorns Website.  Plaintiff can establish that the Longhorns Website shared subscribers' PII and web watching in violation of the VPPA.  Plaintiff can establish that the Longhorns Website did not notify subscribers that their activity would be tracked and shared, and that consent was not offered to or obtained from any subscribers with regard to the website's tracking and sharing of video watching history along with subscribers' PII.

Plaintiff cannot, however, establish the precise contractual terms between the Operator Defendants and UT Defendants. But even at this early stage, Plaintiff has reason to believe that the agreements between the UT Defendants and the Operator Defendants contain an indemnification clause that states the Operator Defendants will hold the UT Defendants harmless.

As part of the investigation performed on behalf of Plaintiff, agreements between the Operator Defendants and other universities, including University at Buffalo and University of Colorado Boulder, were obtained through Freedom of Information Law and Open Record Act requests.  *See* Declaration of Patrick Yarborough, ¶ 3. For example, attached as Exhibit B to the Yarborough Declaration is the Intercollegiate Athletic Marketing, Media Property, Agent Services, and Sponsorship Rights Agreement between Defendant Learfield Communications,

LLC and the State University of New York ("Learfield-College Agreement").  To the extent similar or exact language exists between the Operator Defendant and UT Defendants, it is worth examining Learfield-College Agreement.  For the sake of discussion, Plaintiff presumes similar provisions contained in the Learfield-College Agreement apply to UT and Operator Defendants.

To start, the Learfield-College Agreement contains an "Indemnification" provision, including a hold harmless provision calling for the Operator Defendants to pay defense and liability costs to the university.  The provision on indemnity covers "all damages, claims, losses, charges, actions, suits, or proceedings" and provides for expenses "including but not limited to, reasonable counsel fees." *See* Exhibit B at 7. The application of the provision signifies that the UT Defendants would not be responsible for any judgment, settlement or payment incurred in connection with this litigation.  This case, while properly brought against both sets of defendants will, in the end, not result in costs or payments by the State or a state entity, which is an important factor for the Court to consider in its analysis of whether the UT Defendants should remain in this case.  *See, e.g., Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 123 (Tex. 2015) (noting that sovereign immunity was designed to guard against expenditures associated with defending lawsuits and *paying judgments* "that could hamper government functions" by diverting funds from their allocated purposes).

The Learfield-College Agreement further contains "form" language calling for the Operator Defendants to comply with high commercial practices and standards and adherence with state, federal or local law.  The Learfield-College Agreement affords the university termination rights for such violations. *See* Exhibit B at 5.  The application of that provision here demonstrates that the UT Defendants can, and should, take action with respect to the Operator Defendants' privacy violations of subscribers to the Longhorns Website.

14

The Learfield-College Agreement also stresses the protection of data and calls for nonpublic personal information of individuals (e.g., name, address, telephone numbers, e–mail addresses) to be kept confidential, and that the Operator Defendants will not use, provide, or sell that information to third parties. *Id.* at 9-10.

While discovery is needed to know the extent to which the UT Defendants will be indemnified for the claims at issue in this case, it is unlikely that should the UT Defendants remain in the case they will be held liable and financially responsible for the claims at issue here. Plaintiffs merely seek to keep the UT Defendants in the case for purposes of obtaining injunctive relief.  From an injunctive relief perspective, the UT Defendants are in the position to force the Operator Defendants to come into compliance with the VPPA.  *See supra* § B.

**D.**      **The VPPA As A Valid Exercise of Congress' Section 5 Powers**

Not addressed by the UT Defendants is the rule that Congress can make laws authorizing private suits for money judgments against nonconsenting States pursuant to its enforcement power under Section 5 of the Fourteenth Amendment. *Alden v. Maine*, 527 U.S. 706, 756, 119 S. Ct. 2240, 2267 (1999) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 49 L. Ed. 2d 614, 96 S. Ct. 2666 (1976)).[15]

---

[15] Nor do they address the rule that sovereign immunity does extend where the States agreed in the "plan of the Convention" that their immunity would yield to federal control. *Torres v. Texas Dep't of Pub. Safety*, 142 S. Ct. 2455, 2461–65 (2022); The Federalist Nos. 32 at p. 200 & 81 at 548-49 (J. Cooke ed. 1961) (A. Hamilton) ("where the Constitution in express terms granted an exclusive authority to the Union; where it granted in one instance an authority to the Union and in another prohibited the States from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally *contradictory* and *repugnant*"). Either or both exceptions apply here. *See PennEast,* 141 S. Ct. at 2263 (clarifying the "plan of the Convention" exception to encompass federal dominion over "telecommunications infrastructure").

The powers given to Congress over states in the Fourteenth Amendment "fundamentally altered the balance of state and federal power." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59 (1996). Congress can abrogate state sovereign immunity by passing laws that are "tailored to 'remedy or prevent' conduct infringing the Fourteenth Amendment's substantive prohibitions." *Allen v. Cooper*, 140 S. Ct. 994, 1004 (2020). "[T]o deter those violations, it can allow suits against States for "a somewhat broader swath of conduct," including acts constitutional in themselves. *Id.* Congress must speak with "requisite clarity" to abrogate immunity. *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2262 (2021) ("[A] clear statement is required to subject States to suit in the waiver and [Section 5] abrogation contexts.").

The VPPA clearly abrogates state sovereign immunity in enacting substantive protections for the individual rights protected by Section 1 of the Fourteenth Amendment, in particular the right of privacy. The 100th Congress wrote into the text (and name) of the VPPA that its purpose is to "preserve personal privacy with respect to the . . . delivery of video tapes or similar audio visual materials." The accompanying Senate report says that the VPPA "define[s] the right of privacy by prohibiting unauthorized disclosure of personal information held by video tape providers" and "give[s] meaning to the right of privacy." S. REP. NO. 100-599, at 2 & 7 (1988) (submitted by Sen. J. Biden). The VPPA's text and history both reflect an appreciation for the effect of technology in creating "privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard." *Id.* at 6-7.

The VPPA's basis in Section 5 is reflected in the fact that no state, before now, has ever tried to assert sovereign immunity from the VPPA in the 35 years since its passage. In fact, other states freely concede they are bound by the VPPA. *See, e.g., Travis v. Reno*, 163 F.3d 1000, 1004

(7th Cir. 1998) ("Wisconsin conceded at oral argument that if the state operated a video tape rental service it would be required to comply with § 2710 [of the VPPA]"). And no courts contest that the VPPA may be used offensively by criminal defendants in *state* prosecutions to exclude evidence unlawfully obtained. *See Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1170 (W.D. Wash. 2010).

The text, history, and application of the VPPA makes clear that the 100th Congress, when it passed the VPPA, intended to exercise its authority under Section 5 of the Fourteenth Amendment. The UT Defendants, even if they are arms of the state, are therefore not immune from this suit.

## **CONCLUSION**

For the reasons set forth above, the UT Defendants' Motion to Dismiss should be denied. Alternatively, to the extent any portion of the Motion is granted, Plaintiff requests leave to amend.

Dated: June 21, 2023

Respectfully submitted,

**FOSTER YARBOROUGH, PLLC**

By: /s/ *Patrick Yarborough*
Patrick Yarborough
Marshal J. Hoda*
Jeffrey Lucas Ott
917 Franklin Street, Suite 220
Houston, TX 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202
Email: patrick@fosteryarborough.com
Email: marshal@fosteryarborough.com
Email: luke@fosteryarborough.com

Mark S. Reich (*pro hac vice*)
Courtney Maccarone*
Gary I. Ishimoto*
**LEVI & KORSINSKY, LLP**
55 Broadway, 4th Floor, Suite 427
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiff*

*\*pro hac vice* forthcoming

18