| | |
|---|---|
| ADAM BROWN, on Behalf of Himself and All Others Similarly Situated, | **Case No.: 1:23-cv-00374-DAE** |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| LEARFIELD COMMUNICATIONS, LLC, SIDEARM SPORTS, LLC THE UNIVERSITY OF TEXAS AT AUSTIN, and THE UNIVERSITY OF TEXAS AT AUSTIN ATHLETICS, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Adam Brown ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Learfield Communications, LLC ("Learfield") and Sidearm Sports, LLC ("Sidearm") (collectively the "Defendants"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.  This is a class action brought on behalf of all persons who subscribed to https://texassports.com/ (the "Team Website" or "Longhorns Website") operated by Defendants.

2.  The Team Website provides users with access to video content related to the university's athletics, including pre-recorded clips of games, interviews with players and team staff, sports analysts, and more.

3.     On the Team Website, Defendants offer the option for users to subscribe: (i) through ongoing e-newsletters; and (ii) through signing up for ticket purchasing accounts. Newsletter subscribers are given email updates regarding the Team and content on the Team Website in exchange for their contact information.  The newsletter email updates include links to the Team Website, which contains articles and videos.

4.     Defendants do not disclose on the Team Website that subscribers' personally identifying information ("PII") would be captured by the Facebook Pixel utilized by Defendants (referred to as the "Pixel," discussed and defined herein), and then transferred to Facebook thereby exposing the subscribers' PII to any person of ordinary technical skill who received that data.

5.     Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.

6.     Congress has recognized the immediate and irreversible harm caused by associating a person's personally identifiable information in conjunction with their video watching.

7.     The Video Privacy Protection Act ("VPPA"), prohibits video tape service providers,[1] such as Defendants, from sharing PII. Under the VPPA, PII is information that can specifically tie the identity of an individual to the individual's requested pre-recorded audio video material, either through the title, description, or summary of the video content[2] (the "Video Watching Data").[3]

---

[1] 18 U.S.C. § 2710(a)(4).
[2] 18 U.S.C. § 2710(b)(2)(D)(II).
[3] 18 U.S.C. § 2710.

8.      Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a subscriber's information is shared.

9.      Defendants purposefully implemented and utilized the Pixel, which tracks user activity on the Team Website and discloses that information to Facebook to gather valuable marketing data.  The Pixel cannot be placed on a Team Website without steps taken directly by Defendants or on behalf of Defendants (*e.g.*, by a website manager).  The Pixel cannot be placed on the Team Website by Facebook without the knowledge and cooperation of Defendants.

10.     Defendants do not seek, and have not obtained, consent from users or subscribers to utilize the Pixel to track, share, and exchange their PII with Facebook.

11.     Through those same actions, Defendants violated the Federal Wiretap Act (the "Wiretap Act" or "ECPA") by employing tools which allow third parties to intercept subscribers' search terms leading to video content on the Longhorns Website.

12.     Defendants knew that their Pixel resulted in users' PII and search terms being shared (resulting in VPPA and Wiretap Act violations), and that they failed to obtain users' consent to allow their Pixel to operate in a way that shares users' protected information with Facebook.

13.     Subscribers of the Team Website have been harmed as a result of Defendants' violations of the VPPA and Wiretap Act.  In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendants to immediately (i) remove the Pixel from the Team Website, or (ii) add, and obtain, the appropriate consent from subscribers; or otherwise anonymize video titles in URLs, parameters, and metadata and/or hash subscribers' Facebook user IDs ("UIDs," also referred to as "FIDs") in the Pixel transmissions.

14. Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of subscribers of the Team Website for violations of the VPPA and the Wiretap Act

15. Defendants violated the VPPA the moment, and each time, Plaintiff and class members requested, obtained, or watched a video on the Team Website and had their PII shared.

16. Defendants violated the Wiretap Act the moment, and each time, Plaintiff and class members submitted search terms leading to video content on the Longhorns Website.

**PARTIES**

17. Plaintiff Adam Brown is a resident of Tennessee. In or around the year 2016, Mr. Brown subscribed to Texas Longhorns' newsletters. During the sign-up process, Mr. Brown was not offered or asked for consent to share his information as a result of, or through, Defendants' Pixel. Mr. Brown routinely used the website to watch pre-recorded video content and browse articles, since at least 2019. Mr. Brown also used the Search Bar to find video content on the Team Website using a device that was signed into Facebook. Mr. Brown used the Team Website as recently as December 2022, resulting in Mr. Brown's PII and Video Watching Data being shared with Facebook. Mr. Brown's Facebook profile included personally identifiable information. On February 17, 2023, Mr. Brown served University of Texas at Austin with pre-suit notice of the VPPA violations alleged herein. Mr. Brown would continue or resume using the site should the offending tracking tools be removed or rendered inactive. *See infra* para. 69-70.

18. Defendant Learfield Communications, LLC ("Learfield") was formed in the state of Delaware and is a collegiate sports marketing company with headquarters at 2400 Dallas Parkway, Suite 500 Plano, Texas 75093. Learfield works to connect companies, including

Fortune 500 businesses and Interbrand's brands, to fans. It "provide[s] solutions to [its] partners that include multimedia rights representation, licensing, broadcasting, ticketing, digital solutions, seat sales, in-venue technology, data and brand management, on-location signage, hospitality, and social media."[4] Defendant Learfield can be served by serving its registered agent, C T Corporation System, 350 North St. Paul, Suite 2900, Dallas, Texas 75201.

19. Defendant Sidearm Sports, LLC ("Sidearm Sports") was formed in the state of Missouri with headquarters at 109 S. Warren Street, Suite 600, Syracuse, New York 13202, and an office shared with Learfield at 2400 Dallas Parkway, Suite 500, Plano, Texas 75093. Sidearm Sports provides "official websites, mobile apps, live streaming, stats and more" for "the biggest brands in sports."[5] In 2014, Learfield purchased Sidearm Sports. Sidearm Sports manages websites and mobile platforms, as well as provide the hosting and infrastructure, for colleges and high schools.[6] Sidearm Sports and Learfield packaged their services and offered them to prospective partners, including numerous colleges' sports team websites.[7] Sidearm Sports can be served by serving its registered agent in the state of Missouri, C T Corporation System, 120 South Central Avenue, Clayton, Missouri 63105 or its registered agent in the state of New York, C T Corporation System, 28 Liberty Street, New York, New York 10005.

20. Non-party The University of Texas at Austin ("UT") is a Texas public university and member of the University of Texas System with its principal place of business in Austin, Texas. UT operates and promotes an institution of higher learning and its associated collegiate

---

[4] *Working at LEARFIELD*, LEARFIELD, https://www.learfield.com/working-at-learfield/ (last visited on March 5, 2024).

[5] *About Us: SIDEARM 101*, SIDEARMSPORTS, https://sidearmsports.com/history (last visited on March 5, 2024).

[6] *CBS Interactive Advanced Media, Learfield's Sidearm Sports Partners in College Sports*, SVG NEWS, https://staging.sportsvideo.org/2018/02/12/cbs-interactive-advanced-media-and-learfields-sidearm-sports-to-partner-in-college-sports/ (last visited on March 5, 2024).

[7] *Learfield Sports to Acquire Sidearm Sports*, LEARFIELD, https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on March 5, 2024).

sports teams, including through the development of websites and mobile apps. UT can be served by serving its President, Dr. Jay Hartzell.

21.     Non-party The University of Texas at Austin Athletics ("Longhorns" or the "Team"), formerly known as Longhorns, Ltd., is an enterprise headquartered in Austin, Texas. Longhorns administers and funds UT's athletics programs through operational, fundraising, and commercial activities, such that Longhorns are financially self-sustaining, even without support from UT.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from at least one Defendant.

23.     This Court has personal jurisdiction over Defendants because Defendant Learfield's principal place of business is in the state of Texas, and Defendants all derive revenue in the State of Texas from its management and operational control over the Longhorns Website, as well as the revenue sharing, advertising sales, etc. that the Defendants derive from the Longhorns Website.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants conduct substantial business operations in this District. In connection with the Team Website, the video content, hosting of media accessible to subscribers, and associated coding, all originate and arise out of the Defendants' business operations in this District.

## COMMON FACTUAL ALLEGATIONS

### A.    Background of the Federal Wiretap Act

25.    The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[8]

26.    The Wiretap Act primarily concerned the government's use of wiretaps but was amended in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[9]

27.    Congress was concerned that technological advancements like "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing"[10] were rendering the Wiretap Act out-of-date, Congress amended the Wiretap Act in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[11]

28.    As a result, the ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications like email between users; and (ii) remote computing services like cloud storage or third party processing of data and files.[12]

29.    Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii)

---

[8] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, WASHINGTON AND LEE JOURNAL OF CIVIL RIGHTS AND SOCIAL JUSTICE, https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj (last visited March 5, 2024).

[9] *Id.* at 192.

[10] Senate Rep. No. 99-541, at 2 (1986).

[11] *Id.* at 192.

[12] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

30.     While communicating on the Longhorns Website, users had the contents of their communications with Defendants intercepted by Meta via the Pixel.

31.     The Defendants purposefully included the Pixel on its Longhorns website to intercept Plaintiff's communications and redirect them to Meta to improve the effectiveness of its and Meta's advertising and marketing.

32.     Plaintiffs did not know of or consent to the exposure of their communications with Defendants to Meta.

33.     Defendants and the tracking entities were not intended recipients of the communications, as Plaintiffs did not know of their involvement in the communications. Defendants acted with the intent to have Plaintiff's communications intercepted by Meta to use subscribers' protected, private information for their economic benefit through monetization the information via targeted advertising, and other means.

**B.     Background of the Video Privacy Protection Act**

34.     The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

35.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18

U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). The VPPA was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase, and viewing data.

36.     In 1988, Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audio-visual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

37.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

38.     During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the

'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[13]

39.    Defendants here are video service providers in that they provided pre-recorded audio-visual materials to Plaintiff and Class members on their Team Website.

40.    The relationship between Plaintiff and Defendants is precisely the type of relationship contemplated by the VPPA.

41.    In this case, Defendants knowingly and systematically disclosed Plaintiff's personal viewing information to Facebook, without obtaining their consent, by purposely placing the Pixel on the Team Website with the knowledge it would collect user information.

C.    **How Websites Function**

42.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers, however, websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

43.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[14]

44.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[15]

---

[13] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited on March 5, 2024).
[14] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited March 5, 2024).
[15] *Id.*

45.     When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[16]

46.     An IP address is "a unique address that identifies a device on the internet or a local network."[17] Essentially, an IP address is:

> the identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

*Id.*

47.     When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address. This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[18]

48.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

49.     The Request URL typically contains parameters.  Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of

---

[16] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited March 5, 2024).
[17] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited March 5, 2024).
[18] *Id.*

parameters. Parameters direct a web server to provide additional context-sensitive services,[19] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[20]*

50.     The user's browser then assembles the small chunks back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[21]  This is the visible, and usually interactable, website that most people think of.

51.     To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[22]

52.     Such complex tasks include delivering video material to users by requesting video data from network-connected servers and sending that data to be processed and "encoded" by a media player placed in the web browser by web developers, as discussed in Section C(2), *infra*.

**D.     The Team Website is Managed by Defendants**

**1)     UT granted authority over the Team Website to the Defendants**

53.     Learfield is a collegiate sports marketing company with headquarters at 2400 Dallas Parkway, Suite 500 Plano, Texas 75093. Learfield represents more than 200 of the nation's

---

[19] To see examples of how Learfield used parameters to provide additional information here, this discussed in Section E(3).
[20] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on March 5, 2024).
[21] *Id.*
[22] *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited March 5, 2024).

top collegiate properties including the NCAA and its 89 championships, NCAA Football, leading conferences, and many of the most prestigious colleges and universities in the country.[23]

54.     Sidearm Sports is a provider of collegiate athletic web solutions with headquarters at 109 Warren Street, Suite 600, Syracuse, New York 13202. It manages websites and mobile platforms, as well as provide the hosting and infrastructure, for colleges and high schools.[24]

55.     In 2014, Sidearm Sports was purchased by Learfield,[25] which packaged their services and offered them to prospective partners, including numerous colleges' sports team websites.[26] Sidearm Sports and Learfield jointly implemented their web-based solutions for college teams, cooperatively providing services ranging from digital marketing and web development to intellectual property rights service associated with partner schools' websites (referred to collectively as "Web Services").[27]

56.     Defendants' Web Services are used for college sports websites across the nation. Defendants runs and operates the websites of 1,100 college and universities,[28] including 300 of the 320 schools in Division 1 Sports.[29]

---

[23] *Learfield – IMG College*, LADDERS, https://www.theladders.com/company/learfield-img-college-jobs (last visited on March 5, 2024).
[24] *CBS Interactive Advanced Media, Learfield's Sidearm Sports Partners in College Sports*, SVG NEWS, https://staging.sportsvideo.org/2018/02/12/cbs-interactive-advanced-media-and-learfields-sidearm-sports-to-partner-in-college-sports/ (last visited on March 5, 2024).
[25] *Learfield Sports to Acquire Sidearm Sports*, LEARFIELD (Jun. 23, 2014), https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on March 5, 2024).
[26] *Id.*
[27] *Working at LEARFIELD*, LEARFIELD, https://www.learfield.com/working-at-learfield/ (last visited on March 5, 2024).
[28] *Sidearm Sports, which runs 1,100 college websites from Syracuse, makes big move*, SYRACUSE.COM, https://www.syracuse.com/business-news/2018/09/sidearm_sports_which_runs_1100_college_websites_from_syracuse_makes_big_move.html#:~:text=Eighteen%20years%20later%2C%20his%20company,schools%20in%20Division%201%20sports (last visited on March 5, 2024).
[29] Work at SIDEARM: Openings, SidearmSports, https://sidearmsports.com/openings?gh_jid=5533939003 (last visited on March 5, 2024).

57.     Defendants tout that they are a "trusted provider of official websites, mobile apps, live streaming, stats and more [for college teams]."[30] Defendants "offer[] [their] clients an easy-to-use interface" which includes "content streams and digital presence."[31]

58.     Defendants also offer turn-key Web Services to colleges allowing college teams to select from pre-designed websites, which they describe as "plug and play."[32]  Defendants, in effect, assume the license for the colleges' name and intellectual property for matters pertaining to the college websites.[33]

59.     Defendants offer a "streaming platform [that] deploys an original solution where fans [are] able to find live, original ***and pre-recorded*** content all in one central location."[34] Defendants state that their "[s]treaming [platform] is our single most opted in product for our partners."[35]

60.     In 2018, Learfield announced a partnership with CBS Interactive Advanced Media to produce and operate more than 1,100 college and high school athletic websites, with streaming of more than 14,000 live events each year.[36]

61.     Colleges that have used Defendants' Web Services have noted that using Defendants "[offers] more revenue generation opportunities."[37]

[30] *About Us: SIDEARM 101*, SIDEARMSPORTS, https://sidearmsports.com/history (last visited on March 5, 2024).
[31] *Learfield Sports to Acquire Sidearm Sports*, LEARFIELD (Jun. 23, 2014), https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on March 5, 2024).
[32] *Our Services: Turn-Key Websites*, SIDEARMSPORTS, https://sidearmsports.com/turnkey/ (last visited on March 5, 2024).
[33] *Id.*
[34] *Our Services: SIDEARM Streaming*, SIDEARM SPORTS, https://sidearmsports.com/streaming/ (last visited on March 5, 2024).
[35] *Id.*
[36] *CBS Interactive Advanced Media and Learfield's Sidearm Sports to Partner in College Sports*, LEARFIELD (Feb. 12, 2018), https://www.learfield.com/2018/02/cbs-interactive-advanced-media-learfields-sidearm-sports-partner-college-sports/ (last visited on March 5, 2024).
[37] *See, e.g.*, *YSU Athletics Joins SIDEARM Sports Family*, YOUNGSTOWN STATE UNIVERSITY Sports (May 17, 2022), https://ysusports.com/news/2022/5/17/general-ysu-athletics-joins-sidearm-sports-family.aspx (last visited on March 5, 2024).

62.     One public university website described Defendants' Web Services to include the integration of "records on [their] home page to display a snapshot of each team's performance, a social media wall that integrates engaging content onto the website, and embedded videos and photo galleries to aid in storytelling through a visual medium."[38]

63.     As part of an announced website redesign using Defendants Web Services, a private university stated that Defendants "will manage the website and mobile platforms while providing the hosting and infrastructure for all of the schools."[39]

64.     Another private school announced their partnership with Defendants in 2019 stating that "Sidearm Streaming will provide an All-Access homepage for *video content*, which will house live webcasts, *archived game content*, highlights, features, and interviews with players and coaches."[40]

65.     With respect to ownership rights, Defendants' contracts state that:

*b. Scope of Relationship between College Teams and Sidearm*

Sidearm shall be the owner of the [Web Services] and any and all intellectual property rights therein contained (including but not limited to all patents, trademarks, know how, and business models), and, in further consideration for the rights granted herein to Client, Client hereby assigns to SIDEARM any and all rights, title and interest, including, without limitation, patents, copyrights, trade secrets and proprietary rights, in and to the materials created or developed by SIDEARM hereunder and required to be delivered to Client in connection with the Service (the "Deliverables"). The Deliverables shall not be deemed to be "works made for hire" under the U.S. (or any other jurisdiction's) copyright laws. Client agrees to give SIDEARM reasonable assistance to perfect such assignment of such rights, title and interest. Client will not and will not allow others to reverse engineer, decompile, disassemble or otherwise attempt to derive the source code

---

[38] *A New Era of CSUSBAthletics.com*, CAL STATE SAN BERNADINO ATHLETICS (Dec. 14, 2022), https://csusbathletics.com/news/2022/12/14/general-a-new-era-of-csusbathletics-com.aspx (last visited on March 5, 2024).

[39] *LMU Athletics Launches Website Redesign with SIDEARM Sports*, LOYOLA MARYMOUNT UNIVERSITY ATHLETICS (Aug. 2, 2018), https://lmulions.com/news/2018/8/1/baseball-lmu-athletics-launches-website-redesign-with-sidearm-sports (last visited on March 5, 2024).

[40] *King's Athletics Partners With SideArm Streaming, BlueFrame Technology*, KINGS COLLEGE ATHLETICS (Aug. 2, 2019), https://kingscollegeathletics.com/news/2019/8/2/general-kings-athletics-partners-with-sidearm-streaming-blueframe-technology.aspx (last visited on March 5, 2024).

of any SIDEARM Service or Deliverable, except to the extent allowed under any applicable law.[41]

66. Defendants effectively retain ownership of their Web Services, and require college teams to assign patents, copyrights, trade secrets, and proprietary rights, in connection with materials associated with the Web Services it provides to its partners.

67. Defendants' Web Services include setup and operation of online service platforms and mobile applications with related functionality.[42] Defendants also provide data storage and general video hosting services for all audio and video files for collegiate clients for a period of twenty-four (24) months.[43]

68. In addition to the Web Services described above, Defendants provide and manage all of the technical backend and support services to end users, including subscribers, of the Team Website. This includes providing: (a) support representatives via phone, email, or ticketing system; (b) outside of hours 24/7 critical support; (c) software upgrades at no charge; (d) academic year support hours, normal and after hours; and (e) non-academic year support hours.[44]

69. In addition to the control Defendants have over the operation, content, and overall management of the college team websites managed through the Defendants' Web Services, Defendants have the ability to unilaterally cut of or shut down college team websites.[45]

---

[41] *Triton Regular Meeting of the Board of Trustees* (the "Triton Agreement"), page 39-40, paragraph 8, https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf (last visited on March 5, 2024); *see also Sidearm Sports Renewal for Texas A&M University – Commerce* (the "Texas A&M Renewal Agreement"), p. 13 of 16, paragraph 6.2, https://appsprod.tamuc.edu/contracttransparency/ViewDoc.ashx?I=694&T=P (last visited on March 5, 2024).

[42] Triton Agreement, at page 39/78, paragraph 3, https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf (last visited on March 5, 2024).

[43] *Id.* at page 42/78, paragraph 7.

[44] *Id.* at page 43/78, paragraph 10.

[45] *See Sidearm Sports Proposal for University of New Mexico*, p. 9 of 18, https://athleticscontracts.unm.edu/website-agreement/sidearm-sports---website-agreement---2015.pdf ("Failure to pay the fee within 30 days following the due date may result in suspension of Services") (last visited on March 5, 2024); *Texas A&M Renewal Agreement*, p. 11 of 16,

70.     Defendants require that the collegiate clients will "allow for display of a 'powered by' Sidearm logo(s) and a link to Sidearm's website, privacy policy and terms of use at the bottom of each page on the Client service," and that "the [Web Services] will be provided in accordance with Sidearm's privacy policy and terms of use (as each may be updated from time to time during the term of this Agreement)."

71.     To highlight the primacy of Defendants' Terms, the collegiate websites that utilize Defendants' Web Services offer links to the Defendants' Terms of Service – ***and not to the colleges' own terms*** – on the bottom of the Team Website itself.[46]

72.     Defendants also ensure compliance with the Web Content Accessibility Guidelines (WCAG) 2.0 requirements for all users.[47]

73.     In exchange for Defendants' Web Services, college teams agree to assign all web traffic to Defendants stating:

> Client agrees that the Client's website's traffic (e.g., the amount of data sent and received by Client's website's visitors) will be assigned to Sidearm for purposes of syndicated audience measurement reports, and Client will cooperate with Sidearm to effectuate such purpose, including executing all necessary and/or required assignment documents prepared by companies that provide syndicated audience measurement services.[48]

---

https://appsprod.tamuc.edu/contracttransparency/ViewDoc.ashx?I=694&T=P (same) (last visited on March 5, 2024); *Sidearm Sports Proposal for University of Louisiana Lafayette*, p. 17 of 23, https://purchasing.louisiana.edu/sites/purchasing/files/Attachment%20L%20Sidearm%20contract.pdf (same) (last visited on March 5, 2024).

[46] *See, e.g.*, *Terms of Service*, FLORIDA GATORS, https://floridagators.com/ (linking to http://sidearmsports.com/terms-of-service)(last visited on March 5, 2024); *Terms of Service*, TEXAS LONGHORNS, https://texassports.com/ (linking to http://sidearmsports.com/terms-of-service)(last visited March 6, 2024); *Terms of Service*, UNIVERSITY OF NORTH CAROLINA TARHEELS, https://goheels.com/sports/mens-basketball (linking to https://sidearmsports.com/terms-of-service (last visited on March 5, 2024).

[47] Web Content Accessibility Guidelines (WCAG) 2 is developed through the W3C process in cooperation with individuals and organizations around the world, with a goal of providing a single shared standard for web content accessibility that meets the needs of individuals, organizations, and governments internationally. *See WCAG 2 Overview*, W3C WEB ACCESSIBILITY INITIATIVE WAI, https://www.w3.org/WAI/standards-guidelines/wcag/, (last visited on March 5, 2024).

[48] Triton Agreement, page 42/78, paragraph 9, *available at* https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf (last visited on March 5, 2024).

### 2) Defendants exhibit actual control over and management of the Team Websites

74.     Defendants develop, operate, and own the Team Website.  Defendants effectively retain complete control of the Team Website.  Defendants have the ability to lock the client out of the Team Website; Defendants derive revenue from the Team Website through revenue sharing with advertisers; Defendants reserve their own advertising space on the Team Websites; and Defendants set and implement its own code for generating and tracking advertising on the website, user tracking, video hosting, subscription services, and website design.

75.     Defendants consistently uses tracking tools, such as pixels (including Facebook's and its own), Google's suite of tools (including Google Analytics and Doubleclick Floodlight), comScore, and Salesforce DMP.  As described herein, the Facebook Pixel is a toolset that allows websites to track user activity by monitoring for triggered events and sharing that data with Facebook.

76.     Defendants' own pixel (the "Sidearm Pixel") is also used to monitor user activity on the Team Websites.  Among other things, the Sidearm Pixel tracks which webpages a user visits, when those webpages were published, and which sport a user interacts with:

*Figure 2 - Sidearm Pixel captures sport, team, webpage location of video[49]*

77.     The Sidearm Pixel also tracks which embedded videos, pre-recorded and streaming, were watched on any given webpage:



*Figure 3 - Sidearm Pixel captures path of and title of embedded video watched by user[50]*

78.     Rather than providing its tracking data to UT, this data is sent to statcollector.sidearmsports.com. On information and belief, much of the data Defendants collects from users, from all of its data collection methods, is retained for its own use.

---

[49] *Christopulos Named 2023 Big Ten Gymnast of the Year*, NEBRASKA CORNHUSKERS, https://huskers.com/news/2023/03/28/christopulos-named-2023-big-ten-gymnast-of-the-year (last visited on March 5, 2024).
[50] *Id.*

79.    The Defendants are capable, at any time, of ending Defendants' improper sharing of subscribers' PII.  The Defendants are capable, at any time, of stopping the employment and use of the Facebook Pixel and other tracking tools.  The Defendants are capable, at any time, of ending Defendants' continued and ongoing VPPA violations.   In fact, based on investigation performed on Plaintiff's behalf, the Defendants turned off the Facebook Pixel functionality on at least one of the other college websites it similarly operates and controls and appears to be beginning a shift away from the use of Facebook Pixel as Defendants receive notices of their violations from subscribers.

80.    Defendants also standardize, host, and control the video hosting and video playback services regarding the Team Website's video content.  The video hosting for the Team Website, for example, is depicted below in connection with a CBS video:



*Figure 4 - Texas Longhorns Team Website uses CBS Player to stream video; in this instance, viewed as of March 30, 2023*

81.    As part of its decision-making, over sourced video content, Defendants' additional use of YouTube is depicted below:

```html
▼<div id="player" style="width: 100%; height: 100%;">
  ▼<div class="html5-video-player ytp-exp-bottom-control-flexbox ytp-title-enable-channel-logo
    ytp-fine-scrubbing-exp ytp-embed ytp-embed-playlist ytp-large-width-mode ytp-fit-cover-vide
    o playing-mode ytp-autohide" tabindex="-1" id="movie_player" data-version="/s/player/ace4d6
    69/player_ias.vflset/en_US/base.js" aria-label="YouTube Video Player">
    ▼<div class="html5-video-container" data-layer="0"> == $0
      <video tabindex="-1" class="video-stream html5-main-video" webkit-playsinline
      playsinline controlslist="nodownload" style="width: 878px; height: 494px; left: 0px; to
      p: 0px;" src="blob:https://www.youtube.com/0b0ed8d1-d324-427f-99b5-eeaa661ad5a3">
      </video>
    </div>
    <div class="ytp-gradient-top" data-layer="1"></div>
```

*Figure 5 - Defendants' use of YouTube to host videos; in this instance, viewed as of March 28, 2023*

82.     Despite the existence of dozens of competing content delivery platforms,[51] tellingly, CBS or YouTube appear on each of the Team Websites managed by Defendants.

83.     The code placed on webpages containing video content on the Longhorns Website identifies the specific video content on the webpage as requested by the user, requests that content from servers on behalf of users, and provides the necessary processing (in the form of media player functionality) to turn the data into viewable audio visual content. *See Figures 4 and 5.* In short, Defendants identify the videos, fetch the videos, and play the videos for subscribers, which happens nearly simultaneously.

84.     Defendants even manage the advertising for the Team Websites, for which they carve out their own advertising space and/or share in the revenue of the advertising on the team site. Defendants' control over the advertising is highlighted by the presence of CBS code even where CBS does not host the Team's videos:

---

[51] *See Content Delivery Networks*, CDN PLANET, https://www.cdnplanet.com/cdns/ (last visited on March 5, 2024).

```
window.client_hostname = "huskers.com";window.client_title = "University of Nebraska";window.server_name = "104243
{"page_template":"stories","sport_name":"mgym","sport_name_custom":"mgym","site":"nebraska","cbs_site_code":"neb",
"nebraska";window.dfp_network_code = "21708449227";window.img_dfp_unit_name = "SAIndependent/nebraskalincoln";windo
false;window.reactions = null;window.cbs_ads_activated = true;window.site_colors =
{"safe_text_white":"#000000","safe_text_black":"#ffffff","primary_background":"#E41C38","primary_text":"#ffffff","
= "";window.site_in_dev_mode = false;window.sidearm_header_bidding_enabled = true;
                    window.utagData = function() {
                        return {
                            embedPageUrl: location.href,
                            brandPlatformId: "sidearm_site_" + (document.documentElement.clientWidth > 600 ? "desk
                            pageViewGuid: PageTargetting.getPageviewGuid(),
                            _pageViewGuid: PageTargetting.getPageviewGuid() // cbs says they need it both /shrug
                        };
                    }; == $0
```

*Figure 6 - Defendants' cause use of CBS tracking on University of Nebraska athletics website; in this instance, viewed as of March 28, 2023*

85.     On information and belief, CBS's continued presence on Team Website does not stem of a relationship between CBS and UT, but rather advertising rights it bargained for with Defendants and further indicates Defendants' control over the Team Website's advertising and data management.

86.     The uniformity of the websites designed and operated by Defendants is highly indicative of a copy-paste design stemming from Defendants' control over the Team Website.

**E.      Defendants Utilize the Facebook Pixel to Gather and Transmit PII and Video Watching Data**

87.     Facebook provides various "Business Tools" to web developers to monitor user interactions on their websites, which can then be shared with Facebook. For example, Facebook offers the Facebook Pixel (the "Pixel") and the Facebook Conversions API. Where "the Pixel lets you share web events from a web browser[,] . . . the Conversions API lets you share web events directly from your server."[52]

---

[52] *Business Help Center: About deduplication for Meta Pixel and Conversions API events*, FACEBOOK, https://www.facebook.com/business/help/823677331451951?id=1205376682832142 (last visited March 5, 2024).

88.     The purpose of these Business Tools, regardless of which are used, is the same: to gather, collect and then share user information with Facebook for analysis, generating valuable data about users.

89.     Learfield chose to make use of the Pixel to monitor and transmit user activity from users' browsers. The Pixel tracks subscriber-activity on web pages by monitoring pre-determined events which, when triggered, cause the Pixel to automatically capture relevant data specified by the website developers, bundle that captured data with Facebook cookies, and send the bundled package of data directly to Facebook via an HTTP "Request" the instant the event is triggered.[53]

90.     The Pixel must be added by website developers to a website.  Before gaining access to the Pixel, website developers must agree to Meta's Business Tools Terms, which explicitly clarify for website developers that their use of the Pixel will result in Facebook receiving users' information ". . . that personally identifies [them] . . . " ("Contact Information") and information ". . . about [users] and the actions they take on your websites . . ." ("Event Data").[54] The terms also warn website developers that Facebook will "process the Contact Information solely to match the Contact Information against UIDs ". . . as well as to combine those user IDs with corresponding Event Data."[55]

91.     To add the Pixel to webpages, website developers must add a snippet of code to their own webpage code that, once loaded onto browsers, results in additional Facebook code

---

[53] *Business Help Center: About Meta Pixel*, FACEBOOK,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited March 5, 2024).
[54] *Meta Business Tools Terms*, *Section 1(a)(i)-(ii)*, FACEBOOK,
https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY4CZdRHnQNL2-VtXBCcMUcg-6J-5jU8AL4hOLViKhAWi-SbNmA4QuXlc6yyk877eY&_rdr (last visited March 5, 2024).
[55] *Id.* at Section 2(a)(i)(1).

being called by the webpage to monitor user activity and events.[56] This action cannot occur by accident. When implementing the Pixel, the website developer programs the Pixel to specify which website events ("Pixel Events") to track (e.g., which items are clicked, which webpages are loaded, the metadata tags of content on the webpage), and the Pixel programming connects with Meta's servers to obtain additional Pixel code for the corresponding tracked Pixel Events to begin monitoring user activity on the webpage.

92.     Website developers are given access to the data collected through the use of the Pixel via Facebook's Events Manager tool, which allows website developers to review the URLs correlated to Pixel activity, the parameters and metadata sent through those Pixel activations,

93.     A function of the Pixel is to gather, collect, and then share user information with Facebook.[57] This information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[58]

94.     Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.

95.     The owner of a website – here, Defendants – holds the decision-making authority over the placement of the Pixel on its site. The owner may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc., to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business. The level of

---

[56] *The Facebook Pixel: What It Is And How To Use It*, FACEBOOK (FEB. 5, 2021), https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel (last visited March 5, 2024).
[57] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta for Developers: Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited on March 5, 2024).
[58] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited on March 5, 2024).

management or oversight by the owner, however, does not alter or reduce, and certainly does not eliminate, its responsibility over the information displayed on its site, made available to visitors, or what is gathered about its user and then shared with third parties.

    1) **Defendants added the Pixel to the Longhorns' Website**

96. To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[59] For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage by multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[60]

97. Website developers must also agree to Meta's Business Tools Terms, which explicitly notify website developers that their use of the Pixel will result in Facebook receiving users' personal information and website activity.[61] The terms also caution website developers that Facebook will tie the personal information to their identities by matching their activity with subscribers' Facebook accounts.[62]

---

[59] *Business Help Center: How to set up your Meta Pixel with a business portfolio*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited on March 5, 2024).
[60] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (Jun. 14, 2021), SPROUTSOCIAL, https://sproutsocial.com/insights/facebook-business-manager/ (last visited on March 5, 2024).
[61] *Meta Business Tools Terms*, *Section 1(a)(i)-(ii)*, FACEBOOK, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY4CZdRHnQNL2-VtXBCcMUcg-6J-5jU8AL4hOLViKhAWi-SbNmA4QuXlc6yyk877eY&_rdr (last visited March 5, 2024).
[62] *Id. at* Section 2(a)(i)(1).

98.     Once the Pixel is created, the website operator will assign access to the Pixel to specific people for management purposes,[63] as well as connect the Pixel to a Facebook Ad account.[64]

99.     To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

100.    Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) installing base code in the header of every webpage the Pixel is active, (ii) setting automatic advanced matching behavior, (iii) adding event code using an automated tool or manually,[65] (iv) domain verification, and (v) configuring web events.[66]

101.    After following these steps, a website operator can start harvesting information using the Pixel.

102.    A Pixel cannot be placed on a website by a third-party without being given access by the site's owner.  There are no known instances in which Facebook placed, or has been accused of placing, a Pixel on a website that it did not own.

---

[63] *Business Help Center: Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited on March 5, 2024).

[64] *Business Help Center: Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited on March 5, 2024).

[65] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually.  *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on March 5, 2024).

[66] *Business Help Center: How to set up and install a Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on March 5, 2024); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on March 5, 2024).

103.     When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[67]

104.     A Facebook UID can be used, by anyone, to easily identify a Facebook user.  Any person, even without in-depth technical expertise, can utilize the UID. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

2)  **The Pixel as a Tracking Method**

105.     The Pixel tracks user-activity on web pages by monitoring events which,[68] when triggered, causes the Pixel to automatically send data directly to Facebook.[69]

106.     Examples of events utilized by websites are: a user loading a page with (i) "microdata" tags (the "Microdata event"),[70] or (ii) with a Pixel installed (the "PageView event").[71]  The Team Website utilize both events.[72]

---

[67] *Privacy Center: Cookies Policy*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.1 (last visited on March 5, 2024).
[68] *Business Help Center: About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited on March 5, 2024).
[69]*See generally Id.*
[70] Surya Mattu, et al., *How We Built a Meta Pixel Inspector*, THE MARKUP, https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on March 6, 2024).
[71] *Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited on March 5, 2024).
[72] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See Business Help Center: About the Meta Pixel Helper*,

107.     When a PageView and/or Microdata event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[73]  This confirms that the Pixel events sent data to Facebook.

108.     The HTTP Request includes a Request URL, embedded cookies such as the c_user cookie.  It may also include information in its parameters and metadata tags.

3) **The Pixel Shares Users' PII and Video Watching Data**

109.     When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[74]

110.     The parameters for a Request URL, for instance, may include the title of a video being watched or the URL of the video, as depicted below:



*Figure 7 - PageView event firing, including video title and URL of video as parameters of Request URL[75]*

111.     Descriptive URLs on websites and parameters sent through the Pixel are optional and are used at the discretion of website developers such as Learfield.

112.     Notably, URLs on Learfield's websites did not describe the content of the videos contained on its webpages before 2019. It was a conscious decision to revise Learfield's URL

FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited on March 5, 2024).
[73] *How We Built a Meta Pixel Inspector*, THE MARKUP, https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on March 5, 2024).
[74] *Meta for Developers: Conversion Tracking*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited on March 5, 2024).
[75] *Video: No. 10/10 Men's Basketball player media availability*, TEXAS LONGHORNS (Jan. 10, 2023), https://texassports.com/news/2023/1/10/video-no-10-10-mens-basketball-player-media-availability.aspx (last visited on March 5, 2024).

naming scheme to "mak[e] them more recognizable by search engines and easier to access . . . ."[76]

113.     The parameters sent through Pixel activations, as depicted in *Figure 7*, are <u>*optional*</u> data elements added by Learfield to provide additional data about user activity on the Longhorns Website.[77]

114.     While Microdata events can send data through the parameters, often the Microdata event sends its information through metadata using Microdata tags.

115.     The presence of Microdata tags is optional, and such Microdata data tags were chosen to be used by Defendants.[78]

116.     Microdata events are triggered whenever a web page containing Microdata tags is loaded.[79]

117.     Microdata tags allow developers to nest metadata within the contents of a web page.[80]

118.     This metadata may include the title of a video – for example, here, "title": "\n\tVideo: No. 10/10 Men's Basketball player media availability – University of Texas Athletics\n" – on the Team's website, as depicted below:

---

[76] Joe Benedictis, *New URL Structure*, SIDEARM SPORTS (Oct. 8, 2019), https://playbook.sidearmsports.com/features/new-url-structure/ (last visited March 5, 2024).

[77] "Parameters are optional . . . objects that you can include when tracking standard and custom [Pixel] events. They allow you to provide additional information about your website visitors' actions." *Meta for Developers: Conversion Tracking*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited March 5, 2024).

[78] "Microdata is . . . used to nest metadata within existing content on webpages . . . You <u>can</u> use microdata tags on your website to provide information about your products . . . ." *Meta for Developers: Microdata Tags*, FACEBOOK, https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited March 5, 2024).

[79] *See generally* Surya Mattu, et al., *How We Built a Meta Pixel Inspector*, THE MARKUP, https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on March 6, 2024).

[80] *Meta for Developers: Microdata Tags*, FACEBOOK, https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited on March 5, 2024).



*Figure 8 - Microdata Event sends Microdata tag for video's title to Facebook*[81]

119.    When a Microdata event fires, it sends a request to Facebook containing data, including, but not limited to, the Microdata tags, as depicted in the developer's console above.

120.    When a "c_user" cookie is in place, both the Microdata and PageView event requests include a user's c_user cookie and copy the c_user cookie into the Request Header, as depicted below:

*Figure 9 - Embedded c_user cookie in Pixel Request transmitted to Facebook*[82]

---

[81] *Video: No. 10/10 Men's Basketball player media availability*, TEXAS LONGHORNS (Jan. 10, 2023), https://texassports.com/news/2023/1/10/video-no-10-10-mens-basketball-player-media-availability.aspx (last visited on March 5, 2024).
[82] *Id.*

121.     Both the Microdata and PageView events, when triggered, independently and automatically result in the sharing of a user's website interactions (including Video Watching Data) and UID with Facebook.

122.     Thus, PII and Video Watching Data of subscriber-users, including Plaintiff and Class Members, have automatically been shared with Facebook as a result of Team's decision to add the Pixel to the Team Website.

**F.     <u>Defendants' Newsletters Are Not Distinct Products from the Longhorns Website</u>**

123.     Learfield handles website and streaming management (through Sidearm) and handles ticketing and marketing (through Paciolan).

124.     Sidearm offers a range of services, including website development, mobile app development, and streaming services. Learfield describes Sidearm's portfolio of offerings as: "Sidearm Sports magnifies the digital fan experience through its best in-class web technologies, mobile applications, and fan engagement platforms. Powering official athletic websites, mobile apps, live audio and video streaming, and so much more."[83]

125.     Upon information and belief, Learfield, through Sidearm, does not offer standalone newsletter services.  By all accounts, the newsletters associated with Websites run by Defendants are a gateway to a Sidearm website or mobile app.

126.     To provide this newsletter functionality on Sidearm websites, Learfield  utilizes the resources of its ticketing division, Paciolan. Paciolan provides "leading tech solution[s] connecting fans and patrons to their passion[s]" by offering "solutions in ticketing, fundraising, marketing, analytics, and technology."[84] Paciolan's goal is to "effectively attract and engage fans

---

[83] *Solutions for Colleges & Universities*, LEARFIELD, https://www.learfield.com/schools/ (last visited March 5, 2024).

[84] *About Us*, PACIOLAN, https://www.paciolan.com/about (last visited March 5, 2024).

and patrons, ensuring they return to your venue time and again."[85] This engagement comes in the form of "targeted digital campaigns to personalized offers and automated emails . . . ."[86] In particular, its email marketing allows for "design[ing] campaigns, target[ing] audiences and engag[ing] customers – all from one, powerful platform."[87]

127.     Paciolan offers "PACmail, Paciolan's email marketing tool that establishes direct connections with fans, season ticket holders, and valued donors . . . while providing [teams] with valuable data."[88]

128.     Learfield admits the purpose of PACmail's "web-based email marketing solution" is to enable schools "to continue to send targeted, personalized messages to inspire ticket sales and strengthen relationships."[89] Learfield does not attribute an independent or stand-alone value of its newsletters.  Rather, its use of newsletter is geared toward assisting other products through their websites.

129.     Paciolan's services, including PACmail, are designed to "work seamlessly with Sidearm Sports and the . . . official athletics website[s], opening the doors to a world of optimized web integrations . . . ."[90] This service is designed to integrate with the Websites.

130.     PACmail's marketing utility has been enhanced by Learfield's partnership with Oracle. Oracle's Eloqua Marketing Automation "enable[s] . . . marketers to deliver more rich and personalized communications to fans by integrating Paciolan's ticketing, fundraising, and

---

[85] *Id.*
[86] *Marketing*, PACIOLAN, https://www.paciolan.com/marketing-solutions (last visited March 5, 2024).
[87] *Id.*
[88] *Paciolan Inks New Partnership with Hampton University*, LEARFIELD (Aug. 1, 2023), https://www.learfield.com/2023/08/paciolan-inks-new-partnership-with-hampton-university/ (last visited March 5, 2024).
[89] *University of Maine Selects Paciolan*, LEARFIELD (Jun. 26, 2018), https://www.learfield.com/2018/06/university-maine-selects-paciolan/ (last visited March 5, 2024).
[90] *Paciolan Inks New Partnership with Hampton University*, LEARFIELD (Aug. 1, 2023), https://www.learfield.com/2023/08/paciolan-inks-new-partnership-with-hampton-university/ (last visited March 5, 2024).

attendance data. For example, marketers will be able to send unique offers and messaging to fans about their favorite college . . . based on purchase history, affinity, and preferences. The collaboration . . . gives teams . . . a powerful solution to automate marketing campaigns based on various business needs to . . . drive ticket sales."[91]

131. According to Oracle, the partnership "helps marketers create targeted, cross-channel marketing campaigns, optimize lead generation activities, personalize customer communications, and automate marketing activities."[92]

132. This implies that the newsletters received by Plaintiff Brown and Class Members were exclusive to each user, based on their interactions with the Longhorns Website, including the video content linked through the newsletters.

133. The marketing nature of PACmail and newsletters is significant to Sidearm and Learfield.

134. Even after the commencement of Plaintiff's action, when signing up for the Longhorns Website newsletter, small text on the bottom of the page placed by Sidearm alerts subscribers that they will also be agreeing to Sidearm's Terms of Service. However, the Terms of Service "describes the terms and conditions that govern your use of certain SIDEARM Sports digital products, including interactive web sites . . . and mobile applications, offered by Sidearm Sports . . . ."[93]

135. In fact, the term "newsletter" never appears in the terms, and the only relevant appearance of "email" is in its dispute resolution clause, rather than as a description of the services being provided.[94]

[91] *Paciolan and Oracle Team Up to Personalize Marketing Journeys*, LEARFIELD (Mar. 2, 2022), https://www.learfield.com/2022/03/paciolan-and-oracle-team-up-to-personalize-marketing-journeys/ (last visited March 5, 2024).
[92] *Id.*
[93] *See Figure 11, infra; Terms of Service, Sidearm Sports,* https://sidearmsports.com/sports/2022/12/7/terms-of-service (last visited March 5, 2024).
[94] *Id.*

136.    This follows Learfield's policies regarding its tracking technologies. For instance, in Learfield's advertising policy, which Learfield never presented to the Longhorns Website subscribers, it notes that "advertisements may be served online or by email" and that tracking tools are used "to observe your behaviors and browsing activities over time across email, multiple websites or other platforms."[95]

137.    In all, the subscription to the Longhorns newsletter is a subscription to the Longhorns Website, with the added benefit being Defendants' ability to obtain additional data from users and having additional opportunities to target subscribers with advertising.

138.    While this subscription method may not comport with traditional notions of content behind a paywall being unlocked by a paid subscription of users, that is because the nature of video business has fundamentally shifted – where the videos used to be the product being offered to viewers, video viewers are now the product being offered to advertisers. More viewers equates to more advertising money, regardless of whether those viewers pay to watch content, making a paywall for content harmful to viewer numbers (and advertising revenue) and a free subscription model economically viable for Defendants.

G.    **E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between the Longhorns and Subscribers**

139.    The Longhorns benefit from the value created through its use of free e-newsletters and its subscription-based service model.

140.    E-newsletters are an important and effective business tool.  In fact, 31% of business-to-business marketers say that sending e-newsletters is the paramount way to nurture

---

[95] *Learfield – About Our Ads*, LEARFIELD (May 1, 2022), https://www.learfield.com/ads/ (last visited March 5, 2024).

leads.[96]  Additionally, visitors who reach web pages through e-mails, such as e-newsletters, view more pages per session (2.5 to 1.2), as well as visiting web pages more often than those referred to web pages from Facebook.[97]  Web page visits stemming from e-mails are also more engaged than those from any other platform.[98]  The Longhorns, through its interplay between it free newsletters and increasing traffic to its website, recognized and utilized this business tool.

141.    E-newsletters further provide value by creating brand awareness and broaden interest in the organization itself.[99]  The Longhorns' newsletter effectively served to provide this value.

142.    Newsletters also help the Longhorns obtain additional information about users, such as their names, email addresses, physical addresses, birthdays, and interests.

143.    Finaly, as described above in Section E, emails also provide additional information about user activity to Learfield.

**H.      Sign-up for the Defendants' Subscriptions Lack Informed, Written Consent**

144.    The Team Website does not seek nor obtain permission from their subscribers, including Plaintiff and the Class, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook.

145.    The sign-up processes for the Team Website's newsletters do not seek nor obtain informed, written consent.

---

[96] *What is an Email Newsletter?*, CAMPAIGN MONITOR, https://www.campaignmonitor.com/resources/knowledge-base/what-is-an-email-newsletter/ (last visited on March 5, 2024).
[97] *Content Monetization: Driving Revenue with Email Newsletters*, UPLAND, https://uplandsoftware.com/postup/resources/blog/content-monetization-email-newsletters/ (last visited on March 5, 2024).
[98] *Id.*
[99] *8 Ways to Monetize Email Newsletters for Publishers*, SAILTHRU, https://www.sailthru.com/marketing-blog/8-ways-monetize-email-newsletters-publishers/ (last visited on March 5, 2024) (adding that e-newsletters can serve as a means to hook consumers to more frequently subscribe to a paid subscriptions with the company by providing users a taste of what the site's paid content may offer).

146. To the extent information about any of the Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is not made available as part of the sign-up process; (iii) is not offered to users as checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

147. The Team Website includes a newsletter sign-up, which appears as:[100]



*Figure 10 - Sign up for newsletter as it appeared on April 2, 2023*

_____

[100] *Texas Communications: Email Sign Up Form*, TEXAS LONGHORNS, https://texassports.com/sports/2013/7/25/multimedia_0725132727 (last visited on March 5, 2024).



**Email Sign Up Form**

*Required fields indicated with an asterisk.

Email Address*

First Name*

Last Name*

Zip or Postal Code

Birthday (MM/DD/YYYY)

☐ Texas Faculty/Staff Member
Please check this box above if you are a current Texas Faculty/Staff Member only

**Please select the types of emails you would like to receive:**

☐ News & Updates

☐ Ticket Info & Special Offers

☐ Longhorn Foundation
Donor information including renewals and special events

☐ Forty Acres Insider
Compiled by Vice President and Athletics Director Chris Del Conte

☐ Longhorn Links
A Monday-Friday email report that brings you the day's top headlines from UT Athletics

☐ The Big Ticket
The official student e-newsletter of Texas Athletics

☐ Longhorn Products
The latest Longhorns gear, merch, and deals

☐ T-Association
Official letterwinners organization at The University of Texas at Austin

**Please check all sports that interest you:**

| | |
|---|---|
| ☐ All Sports | ☐ Soccer |
| ☐ Baseball | ☐ Softball |
| ☐ Football | ☐ Volleyball |
| ☐ Men's Basketball | ☐ Other Sports (Olympic Sports) |
| ☐ Women's Basketball | |

Submit

By submitting this form, you agree to our *Terms of Service* and *Privacy Policy*.
You expressly consent to receive electronic communications from Texas Athletics.
You can unsubscribe from communications at any time.

*Figure 11 - Newsletter Signup Form after it was amended on April 11, 2023*

**I.**   **Plaintiff Did Not Consent to Defendants' Sharing of Plaintiff's PII and Video Watching Data**

148.    The VPPA sets out guidelines as to the forms of consent that consumers can give

to video tape service providers to share consumers' information.

149. The VPPA limits video tape service providers' ability to share consumers' PII with third-parties, except where consumers provide "informed, written consent (including through an electronic means using the Internet) . . . in a form that is distinct and separate from any form setting forth other legal or financial obligations of the consumers."[101]

150. Such consent must be at the election of consumers, and consumers must be clearly and conspicuously provided with an opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.[102]

151. While limited information regarding consumers can be shared (e.g., name and address) to third parties, this exemption only applies where video tape service providers give the consumer a clear and conspicuous opportunity to prohibit this disclosure and the disclosure does not identify the title, description, or subject matter of the audio-visual material.[103]

152. Plaintiff and Class Members did not consent to Defendants' Pixel pursuant to the VPPA, as Plaintiff was not asked to provide informed, written consent in a form separate from other legal or financial obligations.

153. Additionally, Plaintiff and Class Members are not given the opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.

154. Finally, Defendants include titles, descriptions, or subject matter of audio-visual materials when sharing Plaintiff's and Class Members' PII.

**J.      Learfield Uses the Information Collected Through Its Tracking Tools, Including the Pixel, to Build and Sell Access to Profiles of Subscribers**

155. The market value of user data collected by Defendants depends on the quantity of users that data represents, and nature of the activities monitored when collecting that data.

---

[101] 18 U.S.C. § 2710(b)(2)(B); 18 U.S.C. § 2710(b)(2)(B)(i).
[102] 18 U.S.C. § 2710(b)(2)(B)(ii); 18 U.S.C. § 2710(b)(2)(B)(iii).
[103] 18 U.S.C. § 2710(b)(2)(D).

156.    As described above in Section D, video services are a significant component of Defendants' overall business.

157.    The hosting and presentment of videos generates more traffic and represents a "more lucrative" venture than non-video content; indeed, video advertising "warrant higher rates than other online ads."[104]

158.    As a result, media outlets report that they aim to create and publish "a couple hundred videos a day" with a hope to "be doing 2,000 videos a day."[105]

159.    The advertisements on those videos, however, only have value to advertisers if they can reach a broad audience that is interested in the advertisers' products or services.

160.    These economics incentivize video providers to make the videos easy to access for users and to gather as much information on users as possible to target them effectively. As users revisit the website, they provide more information on their interests to the website.

161.    Thus, the Team Website seeks to provide widely available content to subscribers, by enticing subscribers to return to the Team Website as often as possible, building a more in-depth profile of each user with each passing visit.

162.    As discussed above in Sections D and E, Learfield makes use of, at a minimum, tracking tools developed by Meta, Oracle, and itself.

163.    On information and belief, Learfield also makes use of tracking tools from Google, Scorecard Research, and likely others.

164.    Learfield collects the data it receives from its tracking tools, including the Pixel, and builds comprehensive profiles of subscribers through its "Fanbase" service.

---

[104] John Herrman, *As Online Video Surges, Publishers Turn to Automation*, THE NEW YORK TIMES (Jul. 10, 2016) https://www.nytimes.com/2016/07/11/business/media/as-online-video-surges-publishers-turn-to-automation.html (last visited March 5, 2024).
[105] *Id.*

165.    According to Learfield, "Fanbase aggregates your athletic department data to create a holistic fan profile and give you a real understanding of your supporters. Insights generated through Fanbase can be used to enhance fan experiences, improve engagement, boost sponsorships, and increase ticket sales."[106]

166.    Learfield touts how its "broad reach across college athletics" puts it in a unique position "to capture significant fan data on behalf of your school."[107]

167.    Learfield offers its Fanbase service to schools by tempting schools with "comprehensive fan profiles . . . [that] puts a world of information at your disposal to help reach your supporters."[108]

168.    These profiles include subscribers' age, gender, demographics, income level, household information such as homeowner status and family status, what purchases a subscriber has made, video views on the website, which URLs are being visited, subscribers' geographic location, subscribers' education level, subscribers' social media information, engagement rates of specific articles and videos, and more, as depicted below:[109]

---

[106] *A Wave of Fan Data is Coming Your Way*, LEARFIELD, https://www.learfield.com/schools/fanbase/ (last visited March 5, 2024).
[107] *Id.*
[108] *Id.*
[109] *Id.*



*Figure 12 - Screen capture provided by Learfield on its Fanbase page to illustrate how it captures users' geographic, sports interest, and social media information*



*Figure 13 - Screen capture provided by Learfield on its Fanbase page to illustrate how it captures users' gender breakdown, social media information and what type of content they interact with*



*Figure 14 - Compares one schools' subscribers' demographic information with another schools' fanbase*



*Figure 15 – Defendants' Fanbase program combines its information with advertising research to create encompassing profiles of Defendants' subscribers*



*Figure 16 - Defendants' Fanbase correlates non-team brands that subscribers interact with on social media platforms to reveal potential advertising partners or sponsorship opportunities*



*Figure 17 - After being processed by Defendants' Fanbase program, subscribers have significant portions of their lives revealed to Defendants and Defendants' advertising partners, including their income bracket, professional life, home life, and more*

169.    Learfield touts to customers that the vast data collected from subscribers "will also fuel the sponsorship conversations we have on your behalf, allowing us to more clearly communicate the value."

170.    Learfield monetizes subscribers' data by enticing schools to use the Fanbase service to target their own subscribers with advertising, as well as to entice potential sponsors who may want to target a school's audience with advertising.

171.    Here, Learfield confirms that the Longhorns Website makes use of the Fanbase service, as depicted below:[110]



Just a sampling of programs already unlocking the value of data

---

[110] *Id.*

172. Defendants cannot plead ignorance as to the scope of the data it collects or its various sources, the purpose of such data collection, or the steps they take to "advance fan access and engagement."[111]

## CLASS ACTION ALLEGATIONS

173. Plaintiff brings this action individually and on behalf of the following Classes:

All persons in the United States with a subscription to the Longhorns' Website that had their video watching activities improperly disclosed to Facebook through the use of the Pixel (the "VPPA Class").

All persons in the United States with a subscription to the Longhorns' Website that had their searches and requests for video content disclosed to Facebook through the use of the Pixel (the "Wiretap Class").

174. Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

175. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

---

[111] Heather Weems, Commissioner of NCHC, SIDEARM SPORTS, https://sidearmsports.com/streaming/ (last visited March 5, 2024); *see also Marketing*, PACIOLAN, *https://www.paciolan.com/marketing-solutions* (last visited March 5, 2024) ("Our personalized and targeted digital campaigns help you pique [users] specific interests . . . ."); *Learfield – About Our Ads*, LEARFIELD (May 1, 2022), https://www.learfield.com/ads/ (last visited March 5, 2024) ("We display interest-based advertising . . . after you leave our website, encouraging you to return. These ads might be . . . served in emails.").

176. This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

177. <u>Numerosity (Rule 23(a)(1))</u>: At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' Team Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

178. <u>Typicality of Claims (Rule 23(a)(3))</u>: Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, subscribed to, and used, a Team Website to watch videos, and had their PII collected and disclosed by Defendants.

179. <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

180. <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class members is relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

181. <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and

fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

1) Whether Defendants collected Plaintiff's and the Class's PII and Video Watching Data;

2) Whether Defendants unlawfully disclosed and continues to disclose the PII and Video Watching Data of subscribers of the Team Website in violation of the VPPA;

3) Whether Defendants' disclosures were committed knowingly; and

4) Whether Defendants disclosed Plaintiff's and the Class's PII and Video Watching Data without consent.

182. Information concerning Defendants' Team Website data sharing practices and subscription members is available from Defendants' or third-party records.

183. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

184. The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

185. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

186. Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiff and the VPPA Class)**

187.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 164 as though fully set forth herein.

188.    Plaintiff brings this count on behalf of himself and all members of the Class.

189.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

190.    Defendants violated this statute by knowingly disclosing Plaintiff's and other Class members' personally identifiable information to Facebook.

191.    Defendants, through the Team Website, engage in the business of delivering video content to subscribers, including Plaintiff and the other Class members, and other users.  The Team Website delivers videos to subscribers, including Plaintiff and the other Class members, by making those materials electronically available to Plaintiff and the other Class members on the Team Website.

192.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

193.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

194. The Defendants are collectively "video tape service providers" because they create, host, and deliver hundreds of videos on its websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

195. Defendants solicit individuals to subscribe to the Team Website newsletters that advertise and promote videos and articles on the Team Website.

196. Plaintiff and members of the Class are "consumers" because they subscribed to the Team newsletters. 18 U.S.C. § 2710(a)(1).

197. Plaintiff and the Class members viewed video clips using the Team Website.

198. Defendants disclosed Plaintiff's and the Class members' personally identifiable information to Facebook. Defendants utilized the Pixel which forced Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook ID, along with Plaintiff's event data, like the title of the videos they viewed.

199. Defendants knowingly disclosed Plaintiff's PII, which is triggered automatically through Defendants' use of the Pixel. No additional steps on the part of the Defendants, Facebook, or any third-party are required. And, once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

200. The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed

written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

201.    Plaintiff and Class members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties. Defendants failed to obtain "informed, written consent" from subscribers – including Plaintiff and Class members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

202.    Defendants' disclosure of Plaintiff's and Class Members' PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

203.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

204.    On behalf of themselves and the Class, Plaintiff seeks: (i) declaratory relief as to Defendants; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18

U.S.C. § 2710(c) as to Defendants; and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II

### VIOLATION OF THE FEDERAL WIRETAP ACT
**18 U.S.C. § 2710, *et seq*.**
**(On Behalf of Plaintiff and the Wiretap Class)**

205.    Plaintiff hereby incorporates by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

206.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against the Defendants.

207.    Codified under 18 U.S.C. U.S.C. §§ 2510 *et seq.*, the Federal Wiretap Act prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

208.    The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

209.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

210.    The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

211.    The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

212. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

213. The Defendants are persons for the purposes of the Wiretap Act.

214. The Pixel and other tracking tools constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

215. The confidential communications Plaintiff and members of the Class had with the Team Website, in the form of their Search Terms and browsing information, were intercepted by the tracking entities and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

216. Plaintiff and members of the Class had a reasonable expectation of privacy in their electronic communications with the Team Website in the form of their Search Terms submitted to the Team Website and browsing information. Even if Plaintiff and members of the Class had would not have had reasonable expectation of privacy in the electronic communications normally, Plaintiff's and Class Members' electronic communications with the Team Websites included descriptions and summaries of the pre-recorded video content they searched for along with their PII, giving rise to a reasonable expectation of privacy pursuant to the VPPA.

217. Plaintiff and members of the Class reasonably expected that third parties were not intercepting, recording, or disclosing their electronic communications with the Team Website.

218. Within the relevant time period, the electronic communications between Plaintiff and members of the Class and the Team Website were intercepted by the Pixel the instant they were sent to the Team Website, without consent, and for the unlawful and wrongful purpose of

monetizing their private information, which includes the purpose of using such private information to develop advertising and marketing strategies.

219.    Interception of Plaintiff's and Class Members' confidential communications with the Team Website occur whenever a user uses the search bar within the Team Website, and when navigating various webpages of the Team Website.

220.    At all times relevant to this Complaint, the Defendants' conduct was knowing, willful, and intentional, as Defendants are sophisticated parties with full knowledge regarding the functionality of the Facebook Pixel and other tracking tools, including that allowing the tracking tools to be implemented on the Team Website would cause the private communications of their subscribers to be shared with third parties.

221.    Plaintiff and members of the Class were never asked for their consent to expose their confidential electronic communications with Team Website to third parties. Indeed, such consent could not have been given as none of the tracking entities, Defendants or Team Websites ever sought any form of consent from Plaintiff or members of the Class to intercept, record, and disclose their private communications with the Team Websites.

222.    As detailed above, the tracking entities' unauthorized interception, disclosure and use of Plaintiff's and the Class Members' confidential communications was only possible through the Defendants' knowing, willful, or intentional placement of the tracking tools on the Team Website. 18 U.S. Code § 2511(1)(a).

223.    Plaintiff and members of the Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiff and members of the Site User Class and USC Site User Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of

the actual damages suffered by Plaintiff and members of the Class and any profits made by the tracking entities as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) appropriate equitable or declaratory relief; (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**Injunctive Relief of Defendants' Ongoing VPPA and Wiretap Violations**

224.    An actual and immediate controversy has arisen and now exists between Plaintiff and the putative class they seek to represent, and Defendants, which parties have genuine and opposing interest in and which their interests are direct and substantial. Defendants have violated, and continue to violate, Plaintiff's rights to protection of his PII under the VPPA.

225.    Plaintiff has demonstrated that he is likely to succeed on the merits of their claims, and is thus, entitled to declaratory and injunctive relief.

226.    Plaintiff has no adequate remedy at law to stop the continuing violations of the VPPA by Defendants. Unless enjoined by the Court, Defendants will continue to infringe on the privacy rights of Plaintiff and the absent class members and will continue to cause, or allow to be caused, irreparable harm to Plaintiffs. Injunctive relief is in the public interest to protect the PII of Plaintiffs, and other consumers that would be irreparably harmed through continued disclosure of their PII.

227.    On February 17, 2023, University of Texas was formally notified by plaintiff Adam Brown of its VPPA violation.  Yet, Defendants continued to share subscribers' PII in violation of the VPPA.

228.    UT operationally handed over control of its website to the Defendants. The Defendants completely disregard their obligation under the VPPA by loading the tracking

methods, including the Facebook Pixel, onto the Team Website and facilitating the sharing of subscribers' PII with third parties for any ordinary person to access and use.

229.    Despite brazenly violating the VPPA, subscribers were provided with no notice of the employment of the Pixel and no indication of how or how much of their information was shared with third parties.  Worse, in further violation of the VPPA, Defendants did not seek or obtain any form of consent from subscribers for the use of the tracking methods to share information improperly pulled from the Team Website.

230.    This threat of injury to Plaintiff from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure his PII is protected from future disclosure.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representatives of the Class and his counsel as Class Counsel;

(b)    For an order declaring that the Defendants' conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendants to immediately (i) remove the Pixel from the Team Website or (ii) add, and obtain, the appropriate consent from subscribers;

(e)    For damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory damages or penalties to the extent available;

(g)     For Defendants to pay $2,500.00 to Plaintiff and each Class member, as provided

by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)     For pre-judgment interest on all amounts awarded;

(i)     For an order of restitution and all other forms of monetary relief;

(j)     An award of all reasonable attorneys' fees and costs; and

(k)     Such other and further relief as the Court deems necessary and appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury of all issues so triable.

Dated: March 6, 2024                    **FOSTER YARBOROUGH**

By: *<u>/s/ Patrick Yarborough</u>*
Patrick Yarborough
Marshal J. Hoda
Jeffrey Lucas Ott
917 Franklin Street, Suite 220
Houston, TX 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202
Email: patrick@fosteryarborough.com
Email: marshal@fosteryarborough.com
Email: luke@fosteryarborough.com

Mark S. Reich (*pro hac vice*)
Courtney Maccarone*
Gary I. Ishimoto
**LEVI & KORSINSKY, LLP**
55 Broadway, 4th Floor, Suite 427
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming