**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

ADAM BROWN, on behalf of himself and
all others similarly situated,

      Plaintiff,                     Case No. 1:23-cv-00374-DAE

      v.                         Hon. David A. Ezra

LEARFIELD COMMUNICATIONS,
LLC, SIDEARM SPORTS, LLC,
UNIVERSITY OF TEXAS AT AUSTIN, and
THE UNIVERSITY OF TEXAS AT AUSTIN
ATHLETICS,

      Defendants.

_____

## <u>DEFENDANTS LEARFIELD COMMUNICATIONS, LLC'S AND SIDEARM SPORTS, LLC'S 12(b)(6) MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

BACKGROUND ......................................................................................................................2

ARGUMENT ...........................................................................................................................3

    I.      LEGAL STANDARD ............................................................................................3

    II.     PLAINTIFF FAILS TO STATE A CLAIM UNDER THE VPPA. .........................3

         i.      Plaintiff Fails, Again, To Allege He Is A "Consumer." ..............................3

         ii.     Plaintiff Does Not—And Cannot—Allege Learfield Knowingly
                Disclosed PII. ............................................................................................6

               1.      The FID Is Not PII. ........................................................................6

               2.      Even If The FID Was PII, Plaintiff Alleges That His Own
                      Browser Disclosed The Information, Not Learfield. ....................10

               3.      Plaintiff Fails To Allege That Learfield Knowingly Disclosed
                      PII. ..............................................................................................12

         iii.    Plaintiff Does Not—And Cannot—Allege Learfield Is A "VTSP." .........12

    III.    PLAINTIFF FAILS TO STATE A CLAIM UNDER THE WIRETAP ACT.......14

         i.      Plaintiff Fails To Allege Any Unlawful Interception Because The
                Wiretap Act Is A One-Party Consent Statute. ...........................................15

         ii.     Computer Code Does Not Constitute A "Device." ...................................17

         iii.    The Information Was Not Intercepted "In Transit." ..................................17

         iv.    The Contents Of Plaintiff's Communications Were Not Disclosed. .........19

CONCLUSION ......................................................................................................................20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................3

*Austin Spearman v. AMC Network Entm't, LLC*,
    98 F. Supp. 3d 662 (S.D.N.Y. 2015)...........................................................5

*B.K. v. Eisenhower Med. Ctr.*,
    No. EDCV232092JGBKKX, 2024 WL 878100 (C.D. Cal. Feb. 29, 2024)......................15, 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................3

*Cantu v. Tapestry, Inc.*,
    No. 22-cv-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. Jul. 10, 2023) ............13

*Carroll v. Gen. Mills, Inc.*,
    No. CV 23-1746 DSF, 2023 WL 4361093 (C.D. Cal. June 26, 2023) ...................13

*Carter v. Scripps Networks, LLC*,
    No. 22-cv-2031 (PKC), 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023)...................3

*Cohen v. Casper Sleep Inc.*,
    2018 WL 3392877 (S.D.N.Y. Jul. 12, 2018) ...............................................16

*Edwards v. Learfield Commc'ns, LLC*,
    No. 1:23-CV-65-AW-MAF, 2023 WL 8544765 (N.D. Fla. Oct. 6, 2023)...........5, 7

*Eichenberger v. ESPN, Inc.*,
    No. 14–cv–463 (TSZ), 2015 WL 7252985 (W.D. Wash. May 7, 2015) ................8

*Ellis v. Cartoon Network, Inc.*
    803 F.3d 1251 (11th Cir. 2015) ...............................................................5, 8

*In re Facebook Priv. Litig.*,
    791 F. Supp. 2d 705 (N.D. Cal. 2011) ......................................................15

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ..................................................................10

*Gardener v. MeTV*,
    No. 22CV5963, 2023 WL 4365901 (N.D. Ill. Jul. 6, 2023) ..............................5

4871-2318-7630.2

*Gilday v. Dubois*,
    124 F.3d 277 (1st Cir. 1997) ................................................................................19

*In re Google Cookie Placement Consumer Priv. Litig.*,
    806 F.3d 125 (3d Cir. 2015).........................................................................15, 16

*Healix Infusion Therapy, Inc. v. Helix Health, LLC*,
    747 F. Supp. 2d 730 (S.D. Tex. 2010) ...............................................................17

*Heather v. Healthline Media, Inc.*,
    No. 3:22-cv-05059-JD, 2023 WL 8788760 (N.D. Cal. Dec. 19, 2023)..................5

*Hernandez v. Chewy, Inc.*,
    No. 223CV05620HDVRAO, 2023 WL 9319236 (C.D. Cal. Dec. 13, 2023).........13

*Hernandez v. The Container Store, Inc.*,
    No. 223CV05067HDVRAO, 2024 WL 72657 (C.D. Cal. Jan. 3, 2024)...............13

*In re Hulu Priv. Litig.*,
    No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ......................7

*Hunthausen v. Spine Media, LLC*,
    No. 3:22-cv-1970-JES-DDL, 2023 WL 4307163 (S.D. Ca. Jun. 21, 2023) ...........5

*Jefferson v. Healthline Media, Inc.*,
    No. 3:22-CV-05059-JD, 2023 WL 3668522 (N.D. Cal. May 24, 2023) ..................5

*Katz-Lacabe v. Oracle Am., Inc.*,
    668 F. Supp. 3d 928 (N.D. Cal. 2023) ................................................................16

*Konop v. Hawaiian Airlines, Inc.*,
    302 F.3d 868 (9th Cir. 2002) ........................................................................17, 18

*Licea v. Am. Eagle Outfitters, Inc.*,
    659 F. Supp. 3d 1072 (C.D. Cal. 2023) ...........................................................18, 19

*Licea v. Cinmar, Inc.*,
    659 F. Supp. 3d 1096 (C.D. Cal. 2023) ..............................................................19

*Markels v. AARP*,
    No. 4:22-cv-5499-YGR, 2023 WL 6411720 (N.D. Cal., Aug. 29, 2023) .................5

*McCausland v. Gray Media Group, Inc.*,
    No. 22CIV7539-PGG, 2024 WL 1374765 (S.D.N.Y. Mar. 31, 2024)....................5

*In re Meta Pixel Healthcare Litig.*,
    No. 22-cv-03580, 2022 WL 17869218 (Dec. 22, 2022, N.D. Cal. 2022)..........11, 12

*Mount v. PulsePoint, Inc.*,
  No. 13 CIV. 6592 (NRB), 2016 WL 5080131 (S.D.N.Y. Aug. 17, 2016) ............................11

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (3d Cir. 2016).................................................................. *passim*

*Peterson v. Learfield Commc'ns LLC, et al.*,
  No. 8:23-cv-146, 2023 WL 9106244 (D. Neb. Dec. 8, 2023) ..................................5

*Robinson*,
  152 F. Supp. 3d at 182 .................................................................................8

*Rodriguez v. Google LLC*,
  No. 20-CV-04688-RS, 2022 WL 214552 (N.D. Cal. Jan. 25, 2022)........................18

*Salazar v. Paramount Global d/b/a 247Sports*,
  No. 3:22-cv-00756, 2023 WL 4611819 (M.D. Tenn. Jul. 18, 2023)........................5

*Steve Jackson Games, Inc. v. U.S. Secret Service*,
  36 F.3d 457 (5th Cir. 1994) ..........................................................................18

*Tawam v. Feld. Ent. Inc.*,
  No. 23-CV-357-WQH-JLB, 2023 WL 5599007 (S.D. Cal. Jul. 28, 2023) .............5, 13

*United States v. Reed*,
  575 F.3d 900 (9th Cir. 2009) .........................................................................19

*In re Vizio, Inc., Consumer Priv. Litig.*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) ...........................................................13

*In re Zynga Priv. Litig.*,
  750 F.3d 1098 (9th Cir. 2014) .......................................................................19

**Statutes**

18 U.S.C. § 1511(2)(d)....................................................................................16

18 U.S.C. § 2510(5) .......................................................................................17

18 U.S.C. § 2510(8) .......................................................................................19

18 U.S.C. § 2511(1)(a).....................................................................................15

18 U.S.C. § 2511(2)(d) ....................................................................................15

18 U.S.C. § 2710(a)(1).................................................................................3, 14

18 U.S.C. § 2710(a)(3).......................................................................................6

18 U.S.C. § 2710(a)(4) ...........................................................................................12, 14

18 U.S.C. § 2710(b)(1) ..........................................................................................3, 8, 11

**Other Authorities**

https://www.merriam-webster.com/dictionary/business ...............................................13

https://www.merriam-webster.com/dictionary/cookie ..................................................11

https://www.merriam-webster.com/dictionary/deliver .................................................14

https://www.merriam-webster.com/dictionary/livelihood ............................................13

Webster's Ninth New Collegiate Dictionary 630 (1985) .............................................18

**INTRODUCTION**

Plaintiff Adam Brown ("Plaintiff") has filed a two-count Amended Complaint asserting the same claim for alleged violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq*. ("VPPA") that this Court previously dismissed while also tacking on a new claim for alleged violation of the Electronic Communications Privacy Act, 18 U.S.C. 2510 *et seq.* (the "Wiretap Act"). Plaintiff alleges that, through web services Learfield Communications, LLC ("Learfield Communications") and Sidearm Sports, LLC ("Sidearm") (collectively, "Learfield") provided for the University of Texas at Austin and The University of Texas at Austin Athletics' (collectively, the "Longhorns") website, https://texassports.com/ (the "Website"), Learfield violated the VPPA and the Wiretap Act by sharing Plaintiff's Facebook User ID ("FID"), search terms, and video viewing information to third parties via marketing and analytics tools on the Website.

Plaintiff's VPPA claim should be dismissed for the same reason identified in this Court's earlier order: "Plaintiffs were subscribers to newsletters, not subscribers to audio visual materials." (Doc. 60 ("Order") at 26.) Plaintiff has not added (and could not possibly add) any allegations to the Complaint which address this fatal defect. This is the most straightforward basis for dismissal again. In any event, if the Court is inclined to also address other issues that it did not reach in its first opinion, the VPPA claim should be dismissed for the further reasons that Plaintiff fails to allege an *ordinary person* would be able to glean his video viewing history from the information allegedly shared through the Facebook Pixel; alleges that Plaintiff's own browser—not Learfield—disclosed Plaintiff's FID to Facebook; and fails to allege Learfield is a video tape service provider.

Plaintiff's new count for alleged violation of the Wiretap Act is equally deficient. The Wiretap Act is a one-party consent statute, and Plaintiff alleges that Learfield was a participant in

the communications and placed the website code at issue on the Website, thereby consenting to any purported interception. What's more, the website code at issue in this case is not a "device" covered by the Wiretap Act. Plaintiff also fails to allege that the contents of his communications were disclosed, or that the information allegedly shared was "intercepted" as defined by the Wiretap Act.

Plaintiff's pleading deficiencies cannot be cured through amendment and, moreover, Plaintiff has already had an opportunity to amend and still failed to state a claim. Learfield respectfully requests that Plaintiff's claims be dismissed with prejudice and without leave to amend.

## **BACKGROUND**

Plaintiff alleges Learfield Communications "is a collegiate sports marketing company," and Sidearm "is a provider of collegiate athletic web solutions" that "manages websites and mobile platforms, as well as provide[s] the hosting and infrastructure, for colleges and high schools." (Am. Compl. ¶¶ 53-54.) Plaintiff alleges that "[i]n or around the year 2016, Mr. Brown subscribed to Texas Longhorns' newsletters." (*Id.* ¶ 17.) Further, Plaintiff alleges "The Longhorns benefit from the value created through its use of free e-newsletters and its subscription-based service model." (*Id.* ¶ 139.) Plaintiff alleges that Learfield Communications and Sidearm are "video service providers in that they provided pre-recorded audio-visual materials to Plaintiff and Class members on their Team Website." (*Id.* ¶ 39.) Specifically, Plaintiff alleges Learfield Communications and Sidearm "develop, operate, and own the Team Website" and "effectively retain complete control of the Team Website." (*Id.* ¶ 74.) Plaintiff alleges Learfield uses "tracking tools, such as pixels (including Facebook's and its own)" and that use of the tracking tools on the Website violates the VPPA and Wiretap Act because the tracking tools send Plaintiff's FID, search terms, and video

2

viewing information to third parties without Plaintiff's informed, written consent. (*Id*. ¶¶ 187-223.)

## ARGUMENT

## I.      LEGAL STANDARD.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

## II.     PLAINTIFF FAILS TO STATE A CLAIM UNDER THE VPPA.

To state a claim under the VPPA, plaintiff must allege that defendant (1) is a video tape service provider; (2) who knowingly disclosed to any person; (3) personally identifiable information; (4) concerning any consumer. *See* 18 U.S.C. 2710(b)(1). Plaintiff has not alleged any of these elements.

### i.      Plaintiff Fails, Again, To Allege He Is A "Consumer."

A "consumer" is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. 2710(a)(1). This Court already held that based on "'[t]he scope of a 'consumer,' when read with sections 2710(b)(1) and (a)(4), and the definition of 'video tape service provider,' . . . a reasonable reader would understand the definition of 'consumer' to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large.'" (Dkt. 60 at 19 (quoting *Carter v. Scripps Networks, LLC*, No. 22-cv-2031 (PKC), 2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023)).) This Court explained that "based on *Carter*, courts have dismissed VPPA claims when the plaintiff has subscribed to a newsletter." (Dkt. 60 at 21.) Applying this reasoning, this Court dismissed Plaintiff's original Complaint

because "it is not pleaded that the videos were watched by virtue of Plaintiffs signing up for the e-newsletter. In fact, those videos were accessible whether or not Plaintiffs subscribed to the newsletter at all." (Dkt. 60 at 24.) This Court further reasoned that "Plaintiffs do not allege that the videos are in the newsletter," but rather only allege that "the newsletter links to videos on the website which the public can access without signing up for the newsletter," and Plaintiffs did not "plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience." (Doc. 60 at 25.)

The Amended Complaint does not fix any of these deficiencies—because Plaintiff cannot make such allegations in good faith. Instead, Plaintiff has merely added allegations that non-party Paciolan has a "partnership" with non-party Oracle that "helps marketers . . . personalize customer communications, and automate marketing activities." (Am. Compl. ¶ 131) Plaintiff alleges "[t]his implies that the newsletters received by Plaintiff Brown . . . were exclusive to each user, based on their interactions with the Longhorns Website, including the video content linked through the newsletters." (*Id.* ¶ 132.) It is unclear why allegations concerning two non-parties would have anything to do with this case against Learfield Communications and Sidearm. In any event, Plaintiff at most is alleging that the content of his email newsletters is personalized. Just as with his original Complaint, Plaintiff does *not* allege that the newsletters contained videos or that he gained access to exclusive video content by virtue of being a newsletter recipient. His allegations continue to make clear that he received free "Texas Longhorns' [email] newsletters" and separately visited the publicly available website "to watch pre-recorded video content and browse articles" that are equally available to all members of the public. (Am. Compl. ¶ 17.) Plaintiff still fails to allege "that a user must log in to watch the video, and Plaintiff does not allege that the video content he accessed was exclusive to a subscribership." (Dkt. 60 at 26; *see also* Dkt 60 at 25 ("the

link in this case does not direct the subscriber to any exclusive content behind a paywall that is only accessible because the user provides valuable data in exchange for a subscription. The link transfers to an open domain that can be accessed by anyone whether or not they subscribe to the newsletter.") Plaintiff is therefore a "subscriber[] to [a] newsletter[], not [a] subscriber[] to audio visual materials" under the *Carter* approach that this Court previously adopted in dismissing the original Complaint. (Dkt. 60 at 26.) Similarly, such allegations do not satisfy the approach from *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015) which considers factors such as "payment, registration, commitment, delivery, expressed association, and[] access to restricted content"—the approach adopted by the Northern District of Florida in *Edwards v. Learfield Commc'ns, LLC*, No. 1:23-CV-65-AW-MAF, 2023 WL 8544765, at *6 (N.D. Fla. Oct. 6, 2023) ("Plaintiffs' signing up for email updates here did not make them 'subscribers.' Signing up requires no 'durable' commitment or real exchange at all…").

This Court's earlier opinion aligns with the overwhelming majority of cases addressing the "consumer" issue in the context of a free email newsletter, and with both other courts that have addressed this issue in the context of VPPA claims brought against Learfield.[1] Having now twice

---

[1] *See, e.g., Markels v. AARP*, No. 4:22-cv-5499-YGR, 2023 WL 6411720, at *3 (N.D. Cal., Aug. 29, 2023) ("[P]laintiffs do not allege that they needed to provide their information or payment to access AARP's videos. Rather, the videos are readily available to anyone who visits the site."); *Tawam v. Feld. Ent. Inc.*, No. 23-CV-357-WQH-JLB, 2023 WL 5599007, at *5 (S.D. Cal. Jul. 28, 2023); *Salazar v. Paramount Global d/b/a 247Sports*, No. 3:22-cv-00756, 2023 WL 4611819, at *12 (M.D. Tenn. Jul. 18, 2023); *Gardener v. MeTV*, No. 22CV5963, 2023 WL 4365901 (N.D. Ill. Jul. 6, 2023); *Hunthausen v. Spine Media, LLC*, No. 3:22-cv-1970-JES-DDL, 2023 WL 4307163, at *3 (S.D. Ca. Jun. 21, 2023); *Jefferson v. Healthline Media, Inc.*, No. 3:22-CV-05059-JD, 2023 WL 3668522, at *3 (N.D. Cal. May 24, 2023); *Austin Spearman v. AMC Network Entm't, LLC*, 98 F. Supp. 3d 662, 671 (S.D.N.Y. 2015) (expressing doubt that "a plaintiff can constitute a subscriber under the VPPA if she subscribes only to a portion of the provider's services that are distinct and set apart from its provision of videos"); *Heather v. Healthline Media, Inc.*, No. 3:22-cv-05059-JD, 2023 WL 8788760, at *2 (N.D. Cal. Dec. 19, 2023); *Peterson v. Learfield Commc'ns LLC, et al.*, No. 8:23-cv-146, 2023 WL 9106244, at *17 (D. Neb. Dec. 8, 2023) (appeal taken and subsequently dismissed); *McCausland v. Gray Media Group, Inc.*, No. 22CIV7539-PGG, 2024

5

failed to state a VPPA claim, Plaintiff's VPPA claim should be dismissed with prejudice.[2]

## ii. Plaintiff Does Not—And Cannot—Allege Learfield Knowingly Disclosed PII.

"Personally identifiable information" is defined to include "information *which identifies a person* as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. 2710(a)(3) (emphasis added). To constitute PII, the information disclosed must itself be "the kind of information that would ***readily permit an ordinary person*** to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016) (emphasis added). Plaintiff fails to allege that Learfield knowingly discloses PII for three distinct reasons. First, the FID that Plaintiff alleges Learfield discloses is not itself PII. Second, Plaintiff's allegations clearly state that Plaintiff's own browser sends this information, not Learfield. Third, Plaintiff has not alleged any disclosure was done knowingly.

### 1. *The FID Is Not PII.*

Plaintiff's Complaint includes this image as the illustrative example of the type of "disclosure" on which he bases his claims:

---

WL 1374765 (S.D.N.Y. Mar. 31, 2024) (dismissing VPPA claim for failure to state plaintiff was a consumer after considering whether someone who (1) inputs his email address on a company's website, and (2) receives a free newsletter containing links to videos on the website that are generally accessible to other website visitors, is a "subscriber" within the meaning of the VPPA.")

[2] As a separate issue, Plaintiff fails, again, to allege that he purchased, rented, or subscribed to *any* goods or services *from Learfield* as required to be a "consumer" under 18 U.S.C. § 2710(a)(1). Rather, Plaintiff specifically alleges that "[i]n or around the year 2016, Mr. Brown subscribed to ***Texas Longhorns' newsletters***," and "*[t]he Longhorns* benefit from the value created through its use of free e-newsletters and its subscription-based service model." (Am. Compl. ¶¶ 17, 139 (emphasis added).) Though the amended complaint adds allegations that non-party Paciolan offers an "email marketing tool" (Am. Compl. ¶ 127), Plaintiff does not allege that either defendant named in this case offers email newsletters, much less that he signed up to receive an email newsletter from either named defendant (or even from non-party Paciolan). Without a single allegation showing that Plaintiff rented, purchased, or subscribed to any goods or services *from Learfield*, Plaintiff is not a "consumer" of Learfield. This is another independent basis for dismissal.

▼ Request Headers
:authority: www.facebook.com
:method: GET
:path: /tr/?id=1912019152142933&ev=PageView&dl=https%3A%2F%2F8279771.fls.doubleclick.net%2Factivity1%3Bdc_pre%3DCILg8bP6iP0CFbxGDwId_4YNLg%3Bsr
c%3D8279771%3Btype%3Dcounter%3Bcat%3Dpagev0%3Bord%3D830444647325993%3Bgtm%3D45He3280%3Bauiddc%3D4624227290.1675963271%3Bu15%3Dundefined%3B~oref%3
Dhttps%253A%252F%252Ftexassports.com%252Fnews%252F2023%252F1%252F13%252Fvideo-no-10-10-mens-basketball-player-media-availability.aspx%3F&rl=ht
tps%3A%2F%2Ftexassports.com%2Fnews%2F2023%2F1%2F13%2Fvideo-no-10-10-mens-basketball-player-media-availability.aspx?if=true&ts=1675963459367&sw
=1536&sh=864&v=2.9.95&r=stable&ec=0&o=30&cs_est=true&it=1675963459196&coo=false&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: sb=sATZYyHbM_JpCBYKkdn1MuNp; datr=sATZYwA65eCj6xEiM9LWCfHd; dpr=1.25; c_user=                    xs=20%3ApIxuCPsPWrwMHA%3A2%3A1675167564%3
A-1%3A8146%3A%3AAcW2JV3i5Bx1VDCupH5uI-VKvEGakdmad_EtSs69gA; fr=0oLGGFL3PkwXWX791.AWXRawumeV_mH76qkUyXpkrBrUI.Bj4mkC.OZ.AAA.0.0.Bj4mkC.AWUUgdB7
nJU
referer: https://8279771.fls.doubleclick.net/
sec-ch-ua: "Chromium";v="110", "Not A(Brand";v="24", "Google Chrome";v="110"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image

(Am. Compl. ¶ 120, Figure 9; *see also id.* ¶ 110, Figure 7; *id.* ¶ 119, Figure 8.) That, on its face, is not "information that would ***readily permit an ordinary person*** to identify a specific individual's video-watching behavior" and is, therefore, not covered by the VPPA. *See Edwards*, 2023 WL 8544765, at *8 ("Although Plaintiffs do allege that the Gators Website transmits metadata, which contains c_user IDs and 'may' contain video titles, [citation omitted], they offer no facts explaining how Facebook accesses that metadata, why doing so does not require technical expertise, or how much metadata Facebook has to comb through to discover someone's c_user ID and the video titles.").

Even if this complex computer code could be deciphered by an ordinary person without technical expertise (and it cannot), Plaintiffs have not alleged the FID contained within the computer code constitutes PII. To the contrary, the FID is merely a static digital identifier which is not PII. The VPPA "protects personally identifiable information that ***identifies a specific person*** and ***ties that person to particular videos that the person watched.***" *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 285 (quoting *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL

1724344, at *8 (N.D. Cal. Apr. 28, 2014) (emphasis added)).[3] Here, Plaintiff's Complaint demonstrates that the sole information allegedly disclosed by Learfield—the FID— is not itself identifying but, rather, is merely a static digital identifier.[4] Static digital identifiers include unique device identifiers that are "randomly generated when a user initially sets up his device and should remain constant for the lifetime of the user's device." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 282, n.124 (citing *Ellis,* 803 F.3d at 1257). These random strings of numbers, when viewed by an ordinary person, do not identify who that person is. Rather, static digital identifiers "fall[] even further down the spectrum [of identifiable information]" because "[t]o an average person, an IP address or ***a digital code in a <u>cookie file</u> would likely be of little help in trying to identify an actual person.***" *In re Nickelodeon*, 827 F.3d at 283 (emphasis added). Although some courts have since held that an FID is PII because it can be plugged into a Facebook URL and PII *may* be found on the resulting Facebook profile, this multi-step investigative process does not make the FID, shared through the "c_user" cookie, PII, as explained by the *Nickelodeon* court.

In *In re Nickelodeon*, the information at issue was plaintiff's IP address, a user's browser and operating system settings, and most importantly, *a computing device's unique device identifier. Id*. at 281-82. The court explicitly held that "the expansion of privacy laws since the Video Privacy Protection Act's passage demonstrates that, whatever else 'personally identifiable

---

[3] *See also Robinson,* 152 F. Supp. 3d at 182 ("the most natural reading of PII suggests that it is the information actually 'disclos[ed]' by a 'video tape service provider,' 18 U.S.C. § 2710(b)(1), ***which must itself do the identifying*** that is relevant for purposes of the VPPA (literally, 'information which identifies')—***not information disclosed by a provider, plus other pieces of information*** collected elsewhere by non-defendant third parties.") (emphasis added).

[4] The *Nickelodeon* Court noted that "[n]umerous district courts have grappled with the question of whether the Video Privacy Protection Act applies to static digital identifiers" and that "[m]ost have followed the rule adopted in *In re Hulu Privacy Litigation*" wherein "[t]he court [] concluded that static digital identifiers that could, in theory, be combined with other information to identify a person do not count as 'personally identifiable information' under the Act, at least by themselves." 827 F.3d at 283 (collecting cases holding the same including *Robinson*, 152 F. Supp. 3d at 182–83; *Eichenberger v. ESPN, Inc.*, No. 14–cv–463 (TSZ), 2015 WL 7252985, at *4–5 (W.D. Wash. May 7, 2015); *Ellis*, 2014 WL 5023535, at *3).

information' meant in 1988, it did not encompass" such static digital identifiers. *Id*. at 286.[5] And unlike other statutes which "gave the FTC authority to expand the types of information that count as personally identifying under that law," "***[t]he Video Privacy Protection Act…does not empower an administrative agency to augment the definition of 'personally identifiable information' in light of changing circumstances or new technologies***. The meaning of that phrase in the Act is, it would appear, ***more static.***" *Id*. (emphasis added.) Further, and more importantly, *In re Nickelodeon* explained Congress's subsequent amendment of the VPPA in 2013 demonstrates Congress was "was keenly aware of how technological changes have affected the original Act" and "***[d]espite this recognition, Congress did not update the definition of personally identifiable information in the statute.***" *Id*. "What's more, it chose not to do so despite . . . submitted written testimony that" specifically argued for "the addition of Internet Protocol (IP) Addresses and ***account identifiers*** to the definition of [personally identifiable information]." *Id*. at 288 (emphasis added).

This Court should follow the detailed reasoning set forth by the *Nickelodeon* court, and adopted by *Edwards*, to hold the FID that Plaintiff alleges was disclosed is ***not*** PII because it is merely a static digital identifier that is automatically sent through a cookie file to a single company, which is nothing like the purposeful and public disclosures of actual names with video viewing history to the public at large. *See id*. at 286. Indeed, "[t]he classic example will always be a video clerk leaking an individual customer's video rental history," and "every step away from that 1988

---

[5] The court compared the VPPA to the similar Children's Online Privacy Protection Act ("COPPA"), which was amended once by FTC rules in 2000 to define personal information to include "a persistent identifier, such as a customer number held in a cookie or a processor serial number, where such identifier is associated with individually identifiable information" and a second time in 2013 to expand the definition to include "'*any persistent identifier that can be used to recognize a user over time and across different Web sites or online services,*' including but not limited to '*a customer number held in a cookie,* an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier.'" *Id*. at 287 (emphasis added).

paradigm will make it harder for a plaintiff to make out a successful claim." Plaintiff's claim here should be dismissed.

>    2.    _Even If The FID Was PII, Plaintiff Alleges That His Own Browser Disclosed The Information, Not Learfield._

Plaintiff alleges Learfield added the Facebook Pixel to the Website and that "[w]hen a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered," which "may include the title of a video being watched or the URL of the video." (Am. Compl. ¶¶ 109-110.) Plaintiff further alleges "[w]hen a Facebook user logs onto Facebook, a 'c_user' cookie—which contains a user's non-encrypted Facebook User ID number (['FID'])—***is automatically created and stored on the user's device for up to a year."*** (*Id*. ¶ 103 (emphasis added).) While Plaintiff alleges the FID can be utilized to identify someone by "appending the Facebook [F]ID to www.facebook.com" (*Id*. ¶ 104), importantly, Plaintiff's allegations clearly state "the Pixel … forced ***Plaintiff's web browser*** to transfer Plaintiff's identifying information, like their Facebook ID." (*Id*. ¶ 198 (emphasis added).) In other words, Plaintiff alleges the c_user cookie containing the FID was placed on his computer by Facebook when he logged into his Facebook account, and that the c_user cookie on his own computer transmits his FID to Facebook when he visits the Website. Plaintiff does ***not*** allege that Learfield ever even possesses the FID—which is something stored in the c_user cookie file on his own computer.

Plaintiff's allegations align with how cookies generally work. For example, *In re Facebook, Inc. Internet Tracking Litig.,* explains that "[w]hen a user creates a Facebook account, more than ten Facebook cookies are placed on the user's browser. These cookies store the user's login ID [FID], and they capture, collect, and compile the referer headers from the web pages visited by the user" and "continued to capture information after a user logged out of Facebook and

visited other websites." 956 F.3d 589, 596 (9th Cir. 2020); *see also In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580, 2022 WL 17869218 at *4 (Dec. 22, 2022, N.D. Cal. 2022) ("Cookies are 'small pieces of text used to store information on web browsers.'"); *Mount v. PulsePoint, Inc.*, No. 13 CIV. 6592 (NRB), 2016 WL 5080131, at *1-2 (S.D.N.Y. Aug. 17, 2016) ("Persistent cookies, commonly called 'tracking cookies,' are designed to remain after the user moves on to a different website or even after the browser is closed. Persistent cookies are set by third parties, including advertising companies that have placed ads on the first-party website."). A "cookie" as defined by Merriam-Webster's dictionary is "a small file or part of a file ***stored on a World Wide Web user's computer,*** created and subsequently read by a website server, and containing personal information (such as a user identification code, customized preferences, or a record of pages visited)." (*See* "Cookie" (df. 3) (https://www.merriam-webster.com/dictionary/cookie) (last visited March 19, 2024) (emphasis added).

Plaintiff's own allegations, the dictionary definition of a "cookie," and case law on third-party Facebook cookies make clear that Plaintiff's FID is stored ***on Plaintiff's computer***—not by Learfield—and subsequently transmitted to Facebook ***by Plaintiff's own browser***. Therefore, even if this Court were to find that FIDs are PII (which they are not), Learfield is not the one that transmits the FIDs to Facebook. The VPPA only applies to an entity that "discloses" PII, 18 U.S.C. § 2710(b)(1), and Learfield cannot possibly "disclose" something it never possesses in the first place.

Plaintiff fails to allege Learfield discloses any other PII, such as his name, to Facebook. Rather, his claim relies solely on the alleged transmission of his FID to Facebook which is transmitted by Plaintiff's own browser ***because Plaintiff has given Facebook consent to collect such information***. (Am. Compl. ¶ 103 ("When a Facebook user logs onto Facebook, a 'c_user'

cookie . . . is automatically created and stored")); *see In re Meta Pixel Healthcare Litig*., 2022 WL 17869218 at \*5 ("Meta gives users the ability to control the use of information about their off-Facebook activity (such as activity on third-party websites) for advertising purposes" and "***Users can 'disconnect' the off-Facebook activity that has been associated with their account—which prevents the data from being used for personalized advertising"***) (emphasis added). Because Plaintiff's specific allegations support that Plaintiff's FID is transmitted by his own website browser, ***which he consented to***—not by Learfield—and because he does not allege that Learfield discloses any other PII to Facebook, Plaintiff fails to allege that Learfield discloses PII.

   3. *Plaintiff Fails To Allege That Learfield Knowingly Disclosed PII.* Beyond Plaintiff's failure to allege that Learfield disclosed PII at all, he also does not allege Learfield had any way to know whether he, or any other user, had an FID, much less what those FIDs were, or whether Plaintiff set his browser to allow Facebook cookies. Therefore, the Complaint does not and cannot plausibly assert that Learfield *knowingly* disclosed his FID, let alone his PII, to Facebook.

   iii.    **Plaintiff Does Not—And Cannot—Allege Learfield Is A "VTSP."**

A "video tape service provider" ("VTSP") is defined as "any person, ***engaged in the business***, in or affecting interstate or foreign commerce, ***of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials*** . . . ." 18 U.S.C. § 2710(a)(4) (emphasis added). The Complaint contains no allegations regarding "prerecorded video cassette tapes," nor does it allege Learfield is "engaged in the business" of rental, sale or delivery of "similar audio-visual materials." 18 U.S.C. § 2710(a)(4). Plaintiff's failure to allege Learfield is a VTSP cannot be fixed by amendment because Learfield's business does not fall within the statutory language.

"Business" is defined as "a usually commercial or mercantile activity engaged in as a means of livelihood." *See* "business" (def. 1a), https://www.merriam-webster.com/dictionary/business (last accessed March 19, 2024). "Livelihood" is defined as "means of support or subsistence." *See* "livelihood" (def. 1), https://www.merriam-webster.com/dictionary/livelihood (last accessed March 19, 2024). Thus, to be "engaged in the business" of a particular activity, that activity must be the company's "means of support or subsistence." *See In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (to be "engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," "the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose"). Delivering video content must be "a focus of the defendant's work" and businesses which are only "peripherally or passively involved in video content delivery do not fall within the statutory definition." *Id.* at 1221-22.

Plaintiff does not allege Learfield is substantially involved in the conveyance of videos. Rather, Plaintiff alleges Learfield drafts code to support the Longhorns' ability to provide videos on the Website and hosts the videos on the Website. (Am. Compl. ¶¶ 74, 80.) Simply drafting code and providing a digital space for videos to reside to the extent the Longhorns want to include videos on their Website is *not* the same as *delivering* the videos themselves. For example, consider a real estate company that leases its building to a Blockbuster video store which sells and rents movies. The real estate company would not be considered to be "delivering" videos simply because it provided the space for Blockbuster to do so.[6] Plaintiff's failure to allege Learfield themselves

---

[6] *See Cantu v. Tapestry, Inc.*, No. 22-cv-1974-BAS-DDL, 2023 WL 4440662, at *8 (S.D. Cal. Jul. 10, 2023); *Carroll v. Gen. Mills, Inc.*, No. CV 23-1746 DSF (MRWx), 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023); *Tawam*, 2023 WL 5599007, at *4; *Hernandez v. The Container Store, Inc.*, No. 223CV05067HDVRAO, 2024 WL 72657, *2 (C.D. Cal. Jan. 3, 2024); *Hernandez v. Chewy, Inc.*, No. 223CV05620HDVRAO, 2023 WL 9319236, at *3 (C.D. Cal. Dec. 13, 2023).

select and offer video materials on the Website calls for dismissal.

Moreover, even if Plaintiff had alleged that the focus of Learfield's business is making videos available on a publicly accessible website, this would not constitute "delivery" of videos. The use of "rental, sale, or delivery" in the definition of "video tape service provider" parallels the use of "renter, purchaser, or subscriber" in the definition of "consumer." *Compare* 18 U.S.C. § 2710(a)(4), *with* 18 U.S.C. § 2710(a)(1). Taken together, these definitions demonstrate that the statute covers a business which "delivers" videos to "subscribers" of those videos. Moreover, the dictionary defines "deliver" as "to take and hand over to or leave *for another*" or "to send, provide, or make accessible *to someone* electronically" such as "deliver an email/text message" or "have the information delivered *to you* via email, cell phone, pager, or just on a Web page *that you set up*." *See* "deliver" df. 2a, 2c, https://www.merriam-webster.com/dictionary/deliver (emphasis added). For example, the Post Office "delivers" the mail because they bring it to a specific person or business to which it is addressed, and the bank electronically "delivers" a person's monthly statement by making it available within an online account specific to the accountholder. If the Post Office simply left a pile of mail sitting in a public street for any member of the public to come and take what they wanted, or if the bank posted the monthly statement on a publicly accessible website for any member of the public to view, we would not say that either had been "delivered." The same is true of videos on a publicly accessible website that are equally available to any member of the public. Even if the focus of Learfield's business was posting such videos (and it is not, even by Plaintiff's own allegations), doing so would not constitute "delivery" under the statute because the videos are not purposefully directed to a specific consumer who subscribed to them.

## III. PLAINTIFF FAILS TO STATE A CLAIM UNDER THE WIRETAP ACT.

Plaintiff alleges that Learfield violated Section 2511(1)(a) of the Wiretap Act. To state a claim for violation of Section 2511(1)(a), Plaintiff must allege that Learfield "intentionally

intercept[ed], endeavor[ed] to intercept, or procure[d] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. 2511(1)(a).

> **i.** **Plaintiff Fails To Allege Any Unlawful Interception Because The Wiretap Act Is A One-Party Consent Statute.**

Plaintiff cannot establish that any communication has been unlawfully "intercepted" by Learfield or the various types of code that Plaintiff alleges Learfield placed on the Team Website. The Wiretap Act is a one-party consent statute. 18 U.S.C. 2511(2)(d) (not unlawful for someone to "intercept . . . electronic communication where such person is a party to the communication."); *see also In re Nickelodeon Consumer Priv. Litig.,* 827 F.3d at 275 (discussing "one-party consent language in the Wiretap Act"). A party to a communication cannot unlawfully "intercept" a communication directed to it and cannot be held liable for "eavesdropping" upon itself. *See id.* at 274 (dismissing Wiretap Act claim because defendant was a party to the communications); *In re Google Cookie Placement Consumer Priv. Litig.,* 806 F.3d 125, 142-43 (3d Cir. 2015) (dismissing Wiretap Act claim because tracking cookies placed by advertising providers made the advertiser the intended recipient of the electronic transmission); *In re Facebook Priv. Litig.,* 791 F. Supp. 2d 705, 713 (N.D. Cal. 2011) (dismissing Wiretap Act claim on same grounds); *B.K. v. Eisenhower Med. Ctr.,* No. EDCV232092JGBKKX, 2024 WL 878100, at *5 (C.D. Cal. Feb. 29, 2024) (dismissing Wiretap Act claim involving Pixel because defendant was website operator and, therefore, was a party to the information that plaintiff entered on its website).

Here, Plaintiff goes to great lengths to allege that Learfield owns and operates the website and that Learfield placed various types of alleged "tracking tools" on the website. (Am. Compl. ¶¶ 74-86.) Therefore, Plaintiff's Wiretap Act claim fails because according to Plaintiff's allegations, Plaintiff's communications with the website were communications with Learfield, and Learfield consented to any purported interception of Plaintiff's communications by the so-called "tracking

tools" that Learfield allegedly placed on the website. *See Katz-Lacabe v. Oracle Am., Inc.,* 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) ("[a]s Defendant's customers must have chosen to deploy Oracle's tools on their websites, it necessarily follows that "one of the parties to the communication"—the websites themselves—gave "prior consent to such interception.")

While there is a statutory exception under the Wiretap Act where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State," 18 U.S.C. § 1511(2)(d), this exception does not apply to the alleged interception itself; instead, "a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording." *In re Google Cookie Placement,* 806 F.3d at 145 (emphasis in original) (citation omitted).

Plaintiff's claim is tethered to the alleged transmission of browsing and search activities on Learfield's public website, not another independent tortious or criminal act. *See B.K.*, 2024 WL 878100 at *5 (dismissing Wiretap Act claim holding that, "[w]hile Plaintiffs allege that Defendant engaged in the allegedly illegal interception of their and the proposed class members' information 'for Defendant's commercial advantage,' Plaintiffs do not allege that this purpose constitutes independently illegal or actionable conduct such that the party exception is inapplicable."); *Cohen v. Casper Sleep Inc.*, 2018 WL 3392877, at *3-4 (S.D.N.Y. Jul. 12, 2018) (rejecting argument that tortious or criminal conduct exception should apply to alleged internet tracking; "This too fails because Defendants did not intercept communications 'for the purpose' of committing a crime or tort."). As Plaintiff alleges, Learfield's goal in using the Pixel was to "improve the effectiveness of its and Meta's advertising and marketing." (Am. Compl. ¶ 31.) This purpose fails to meet the crime-tort exception. *See Katz-Lacabe,* 668 F. Supp. 3d at 945 (dismissing Wiretap claim in pixel

case because the crime-tort exception "does not apply to a case such as this, where Defendant's 'purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money.'") This claim should be dismissed with prejudice.

## ii. Computer Code Does Not Constitute A "Device."

To state a claim under the Wiretap Act, a plaintiff must "allege that a communication was intentionally intercepted through use of a device." *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 744 (S.D. Tex. 2010) (citing 18 U.S.C. § 2510(5)). The Southern District of Texas has held that "the drive or server on which an e-mail is received does not constitute a 'device' for purposes of the Wiretap Act." *Id.* Here, Plaintiff does not allege that any "device" was used to capture his communications, but rather bases his claim on computer code present on the Website. (*E.g.*, Am. Compl. ¶¶ 91, 99-100 (referring to "code"). Computer code is akin to "the drive or server" at issue in *Healix* and is not a "device" under the Wiretap Act. This is yet another independent basis on which to dismiss the Wiretap Act claim.

## iii. The Information Was Not Intercepted "In Transit."

Plaintiff fails to allege that any information was intercepted "in transit" as opposed to merely acquired at some point by a third party. As one federal appellate court has explained, "[s]tanding alone, this definition [of 'intercept'] would seem to suggest that an individual 'intercepts' an electronic communication merely by 'acquiring' its contents, regardless of when or under what circumstances the acquisition occurs. Courts, however, have clarified that Congress intended a narrower definition of 'intercept' with regard to electronic communications." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 876 (9th Cir. 2002). Therefore, "for a website such as [defendant's] to be 'intercepted' in violation of the Wiretap Act, it must be acquired during transmission, not while it is in electronic storage" because "[t]his conclusion is consistent with the ordinary meaning of 'intercept,' which is 'to stop, seize, or interrupt in progress or course before

arrival.'" *Konop*, 302 F.3d at 878 (citing Webster's Ninth New Collegiate Dictionary 630 (1985)). *See also Steve Jackson Games, Inc. v. U.S. Secret Service*, 36 F.3d 457, 462 (5th Cir. 1994) ("Congress did not intend for 'intercept' to apply to 'electronic communications' when those communications are in 'electronic storage.'").

Plaintiff fails to allege that the communications allegedly being shared with any third parties through use of the Pixel technologies were intercepted *in transit* by any third party. Rather, Plaintiff simply alleges that the information is "captured" and "shared" with third parties like Facebook. *See* Compl. ¶¶ 87 ("Facebook provides various 'Business Tools' to web developers to monitor user interactions on their websites, which can then be shared with Facebook."); ¶ 89 ("pre-determined events which, when triggered, cause the Pixel to automatically capture relevant data specified by the website developers, bundle that captured data with Facebook cookies, and send the bundled package of data directly to Facebook."); ¶ 93 ("[a] function of the Pixel is to gather, collect, and then share user information with Facebook. This information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customer.").

These allegations show that Facebook is not actively intercepting or viewing the communications as they are in transit, as required to allege a Wiretap claim, but rather, they are being stored by the Pixel for Facebook to access at its leisure to use in marketing efforts. *See Rodriguez v. Google LLC*, No. 20-CV-04688-RS, 2022 WL 214552 at *1 (N.D. Cal. Jan. 25, 2022) ("plaintiff failed to allege sufficient allegations where '[p]laintiffs reference an 'open line of communication,' and 'real-time ad bidding' in support of [their] theory, but neither describes how Google actually intercepts data in real time.'"). Indeed, in *Licea v. Am. Eagle Outfitters, Inc.*, 659 F. Supp. 3d 1072, 1085 (C.D. Cal. 2023) the court dismissed a similar Wiretap claim, holding that

"[b]are allegations of recording and creating transcripts do not specifically allege that Plaintiffs' messages were intercepted while in transit." The *Licea* court explained that, "[t]he timeline of the automatic recording and transcription is unclear, as it could occur during transit or it can take place after receipt of the message in Defendant's inbox. Plaintiffs do not sufficiently allege how the messages were intercepted, and thereby do not provide fair notice to Defendant of their alleged violation." *Id.*; *see also Licea v. Cinmar, Inc.*, 659 F. Supp. 3d 1096, 1110 (C.D. Cal. 2023) (holding same).

Because "acquiring" or "capturing" information for later use by a third party does not constitute "interception" as defined under the Wiretap Act, Plaintiff's Wiretap claim must be dismissed.

### iv.    The Contents Of Plaintiff's Communications Were Not Disclosed.

Under the Wiretap Act, "contents" is defined as "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8). Several courts have interpreted the term "contents" to mean "the intended message conveyed by the communication and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (citing *United States v. Reed*, 575 F.3d 900, 917 (9th Cir. 2009) (holding that information about a telephone call's "origination, length, and time" was not "contents" for purposes of § 2510(8), because it contained no "information concerning the substance, purport or meaning of [the] communication"); *Gilday v. Dubois*, 124 F.3d 277, 296 n. 27 (1st Cir. 1997) (holding that a device that "captures electronic signals relating to the [personal identification number] of the caller, the number called, and the date, time and length of the call" does not capture the contents of communications and therefore "is not within the ambit of the Wiretap Act.). Plaintiff only alleges that search terms embedded in computer code that are automatically created upon a users'

visit to Learfield's website were allegedly disclosed, amongst other record information. Therefore, Plaintiff's Wiretap Act claim must be dismissed because no contents of communications were disclosed but rather, only record information.

## **CONCLUSION**

For the foregoing reasons, Learfield Communications, LLC and Sidearm Sports, LLC respectfully request that this Court dismiss Plaintiff's Amended Class Action Complaint with prejudice.

Dated: April 3, 2024                  Respectfully submitted,

*/s/Rachel Palmer Hooper*
Rachel Palmer Hooper
Texas Bar No. 24039102
**BAKER & HOSTETLER LLP**
811 Main Street, Suite 1100
Houston, TX 770002
Telephone: 713.751-1600
Facsimile: 713-751-1717
rhooper@bakerlaw.com

Bonnie Keane DelGobbo (*pro hac vice*)
Illinois Bar No. 6309394
**BAKER & HOSTETLER LLP**
1 North Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: 312-416-8185
Facsimile: 312-416-6201
bdelgobbo@bakerlaw.com

*Attorneys for Defendants Learfield*
*Communications, LLC and Sidearm Sports, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically filed on April 3, 2024 with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

*/s/Rachel Palmer Hooper*